**KESSLER TOPAZ**
    **MELTZER & CHECK, LLP**
ELI R. GREENSTEIN (Bar No. 217945)
egreenstein@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

**ROBBINS GELLER RUDMAN**
    **& DOWD LLP**
STUART A. DAVIDSON
sdavidson@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000
Fax: (561) 750-3364

**CARELLA, BYRNE, CECCHI,**
    **OLSTEIN, BRODY & AGNELLO, P.C.**
JAMES E. CECCHI
jcecchi@carellabyme.com
5 Becker Farm Road
Roseland, NJ 07068
Tel: (973) 994-1700
Fax: (973) 994-1744

**SEEGER WEISS LLP**
CHRISTOPHER A. SEEGER
cseeger@seegerweiss.com
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel: (973) 639-9100
Fax: (973) 639-9393

*Attorneys for Plaintiff Diana Hauck*
*[additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| DIANA HAUCK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ADVANCED MICRO DEVICES, INC.,<br><br>Defendant. | Civil Action No._____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Diana Hauck ("Plaintiff"), on behalf of herself and all others similarly situated, hereby alleges the following based on personal knowledge as to herself and her own conduct, and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.    Defendant Advanced Micro Devices, Inc. ("Defendant" or "AMD") is a leading manufacturer of central processing units ("CPUs" or "processors").  AMD's processors are integrated—with AMD's assistance and guidance—into desktop and laptop computers and servers manufactured by, *inter alia*, Dell Inc., Lenovo Group Limited, and HP Inc.

2.    Given that CPUs are responsible for executing instructions provided by various software programs, the processing speed of a CPU is critical to running software programs effectively and efficiently.  Likewise, a CPU's ability to securely process data is critical to maintaining the integrity of a user's confidential and sensitive information.

3.    To this end, AMD touts itself as the "high-performance computing leader for the gaming, immersive platform, and datacenter markets," and prides itself on its research and development activities focused on "improving product performance and enhancing product design."[1] Similarly, AMD has long promoted the purported speed and security of its processors in marketing materials directed to customers.  For example, when AMD launched its AMD Ryzen™ mobile processor in October 2017, AMD represented that the Ryzen™ mobile processor was "the fastest processor for ultrathin notebooks" and that these "processors provide blazing fast performance."[2]

4.    However, unbeknownst to Plaintiff and members of the Class (defined herein), AMD's processors are defective.  Specifically, AMD's processors are incapable of operating at represented processing speeds without exposing users to at least one security vulnerability (the

---

[1]    Advanced Micro Devices, Inc., 2016 Annual Report, http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MzcwMzI1fENoaWxkSUQ9LTF8VHlwZT0z&t=1&cb=636251116960573121 (last accessed January 19, 2018).

[2]    Advanced Micro Devices, Inc., *AMD Introduces New Ryzen Mobile Processors, the World's Fastest Processor for Ultrathin Notebooks*, October 26, 2017, http://markets.businessinsider.com/news/stocks/AMD-Introduces-New-Ryzen-Mobile-Processors-the-World-s-Fastest-Processor-for-Ultrathin-Notebooks-1-New-Ryzen-7-2700U-and-Ryzen-5-2500U-Mobile-Processors-with-Radeon-Vega-Graphics-Deliver-Blazingly-1005703897 (last accessed January 19, 2018).

CLASS ACTION COMPLAINT                                                                     1

"Defect")—known as "Spectre"—which "allow[s] programs to steal data which is currently processed on the computer."[3]  Specifically, the "Spectre [Defect] steals data from the memory of other applications running on a machine."[4]

5.    After the Spectre Defect, and a related defect known as Meltdown, were publicly revealed by *The Register* on January 2, 2018,[5] it was reported that AMD had known about the Spectre Defect since ***at the latest*** June 1, 2017.[6]  Notwithstanding AMD's knowledge of the Spectre Defect— and the fact that AMD should have known of the Defect many years ago—AMD continued to advertise, manufacture, distribute, and sell the defective processors to members of the Class.

6.    AMD's processors are vulnerable to the Spectre Defect—considered a "much more insidious attack"[7]—which cannot be effectively fixed through software "patches" or updates.  In fact, efforts to mitigate Spectre and Meltdown—which "impact fundamental aspects of how mainstream processors manage and silo data"—have resulted in "corresponding performance slowdowns" given that "the fixes involve routing data for processing in less efficient ways."[8]  Initial estimates have suggested that software patches intended to mitigate Spectre and Meltdown may reduce processing

---

[3]    Graz University of Technology, *Meltdown and Spectre*, https://spectreattack.com/ (last accessed January 19, 2018).

[4]    Andy Greenberg, *A Critical Intel Flaw Breaks Basic Security for Most Computers*, WIRED, January 3, 2018, https://www.wired.com/story/critical-intel-flaw-breaks-basic-security-for-most-computers/ (last accessed January 19, 2018).

[5]    *See* John Leyden and Chris Williams, *Kernel-memory-leaking Intel Processor Design Flaw Forces Linux, Windows Redesign*, THE REGISTER, January 2, 2018, https://www.theregister.co.uk/2018/01/02/intel_cpu_design_flaw/ (last accessed January 19, 2018).

[6]    *See* Samuel Gibbs, *Meltdown and Spectre: 'Worst Ever' CPU Bugs Affect Virtually All Computers*, THE GUARDIAN, January 4, 2018, https://www.theguardian.com/technology/2018/jan/04/meltdown-spectre-worst-cpu-bugs-ever-found-affect-computers-intel-processors-security-flaw (last accessed January 19, 2018) ("Google said it informed the affected companies about the Spectre flaw on 1 June 2017 and later reported the Meltdown flaw before 28 July 2017.").

[7]    Ryan Smith, *Understanding Meltdown & Spectre: What to Know About New Exploits That Affect Virtually All CPUs*, ANANDTECH, January 4, 2018, https://www.anandtech.com/show/12214/understanding-meltdown-and-spectre (last accessed January 19, 2018).

[8]    Lily Hay Newman, *Meltdown and Spectre Fixes Arrive—But Don't Solve Everything*, WIRED, January 6, 2018, https://www.wired.com/story/meltdown-and-spectre-vulnerability-fix/ (last accessed January 19, 2018).

speed by as much as thirty percent[9] and Microsoft Corp. has recently confirmed that Spectre-related patches for computers running Windows operating systems with affected processors result in "a performance impact."[10]

7.    Plaintiff and members of the Class would not have purchased or leased—or would have paid substantially less for—AMD processors (or devices containing AMD processors) had they known of the Spectre Defect and the reduction in processing performance associated with efforts necessary to mitigate the substantial security risks presented by the Spectre Defect.

8.    Defendant's conduct violates state common law and state and federal statutory law.

9.    Accordingly, Plaintiff brings this class action against Defendant individually and on behalf of all other persons and entities in the United States that purchased or leased one or more AMD processors, or one or more devices containing an AMD processor.

## II.    PARTIES

10.    Plaintiff Diana Hauck is a resident of the State of Louisiana.  On November 4, 2016, Plaintiff purchased an HP 15-ba079dc Notebook computer, containing an AMD A10-9600P processor, for $349.99.

11.    Defendant AMD is a Delaware corporation with its principal place of business located within this District at 2485 Augustine Drive, Santa Clara, California.  Defendant is engaged in the business of designing, manufacturing, selling, and/or distributing CPUs, including the defective processors at issue here.  All references herein to any act of AMD shall include the acts of AMD's directors, officers, employees, affiliates, subsidiaries, and agents where such persons or entities were engaged in the management, direction, or control of AMD, or where such persons or entities were acting act the direction of AMD.

---

[9]    *See* John Leyden and Chris Williams, *Kernel-memory-leaking Intel Processor Design Flaw Forces Linux, Windows Redesign*, THE REGISTER, January 2, 2018.

[10]    Terry Myerson, *Understanding the Performance Impact of Spectre and Meltdown Mitigations on Windows Systems*, MICROSOFT CORP., January 9, 2018, https://cloudblogs.microsoft.com/microsoftsecure/2018/01/09/understanding-the-performance-impact-of-spectre-and-meltdown-mitigations-on-windows-systems/ (last accessed January 19, 2018).

III.    **JURISDICTION AND VENUE**

12.    This Court has general personal jurisdiction over Defendant because it resides within this District.

13.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this matter is a putative class action, the Class contains members, including Plaintiff, that are citizens of a state different from Defendant, there are more than 100 members of the Class, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000.

14.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts a substantial amount of business in this District.

15.    Assignment to the San Jose Division of this District is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to Plaintiff's claims occurred within the District and Defendant's principal place of business is located in Santa Clara, California.  Pursuant to Northern District of California Civil Local Rule 3-2(e), all civil actions which arise in the Santa Clara County shall be assigned to the San Jose Division.

IV.    **FACTUAL ALLEGATIONS**

16.    AMD is a leading manufacturers of CPUs—the so-called "brains" of computer systems (and other electronic devices)—which are responsible for processing system data and controlling other devices and components connected to the system.

17.    AMD both sells its processors to the marketplace as stand-alone components and sells its processors to third-party manufacturers that—with AMD's assistance and guidance—incorporate AMD's processors into, among other things, desktop and laptop computers and servers.  Third-party manufacturers utilizing AMD processors include household names such as Dell Inc., HP Inc., and Lenovo Group Limited.

18.    Fundamental to the operation of a CPU is the operating system's "kernel"—the program responsible for directing and coordinating access to the CPU, random-access memory, and other components such as keyboards, mice, disk-drives, printers, and monitors.  In order to ensure

effective performance and maintain security, the kernel is responsible for preventing data associated with one program from being accessed or overwritten by another program.

**A.      AMD Touts the Processing Speed and Security of Its Processors**

19.      Processing speed and security are two of the key attributes of CPUs.   Without sufficient processing speed, a CPU will be unable to effectively and efficiently run the computer's operating system and software programs, and utilize connected hardware and peripheral devices. Similarly, without sufficient data security, a CPU will not be able to satisfy users' needs for the processing, communication, and storage of sensitive and confidential information.

20.      Given these market demands, AMD has consistently highlighted the purported speed and security of its processors in communications with its prospective customers.  For example, when AMD launched its AMD Ryzen™ mobile processor in October 2017, AMD represented that the Ryzen™ mobile processor was "the fastest processor for ultrathin notebooks" and that these "processors provide blazing fast performance."[11]  Similarly, AMD touted that "[t]he Ryzen™ mobile processor learns, predicts and adapts to your actions, delivering optimal power and performance for compute and graphics intensive applications."[12]

21.      In addition to these product-line representations, AMD specifically markets each model of its processors based on their respective processing speeds.  For example, AMD's website allows prospective customers to directly and easily compare the processing speed (or "clock speed") of each of its processors, and explicitly references its processors' "clocks" as setting its processors apart from the competition:[13]

---

[11]      Advanced Micro Devices, Inc., *AMD Introduces New Ryzen Mobile Processors, the World's Fastest Processor for Ultrathin Notebooks*, October 26, 2017.

[12]      Advanced Micro Devices, Inc., AMD Ryzen™ Mobile Processors with Radeon™ Vega Graphics, https://www.amd.com/en/products/ryzen-processors-laptop (last accessed January 19, 2018).

[13]      *See* Advanced Micro Devices, Inc., AMD Ryzen™ PRO Mobile Processors, https://www.amd.com/en/products/ryzen-pro-processors-laptop (last accessed January 19, 2018); Advanced Micro Devices, Inc., AMD A10-Series APU for Laptops Results, http://products.amd.com/en-us/search/apu/amd-a-series-processors/amd-a10-series-apu-for-laptops (last accessed January 19, 2018).

| COMPARE | PLATFORM | PRODUCT | SPECS | SHOP |
|---------|----------|---------|-------|------|
| ☐ | Laptop | 7th Gen A10-9600P APU AM960PADY44AB | **Cores:** 4 **Speed/Max:** 2.4 GHz/3.3 GHz **Default TDP:** 15W **Package:** FP4 | Laptops |



### B.    The Spectre Defect

22.    Rather than processing instructions in sequential order, AMD CPUs are designed to process multiple program instructions in parallel through so-called "out-of-order" or "speculative" execution.  Through the process of "speculative execution," "processor makers have tried to speed up the way chips crunch data and run programs by making them guess" the data the processor will need for the next task.[14]

23.    As explained by the team of researchers from the Graz University of Technology that helped expose the Spectre Defect:

> Speculative execution is a technique used by highspeed processors in order to increase performance by guessing likely future execution paths and prematurely executing the instructions in them.  For example when the program's control flow depends on an uncached value located in the physical memory, it may take several hundred clock cycles before the value becomes known.  Rather than wasting these cycles by idling,

---

[14]    Ian King, Jeremy Kahn, Alex Webb, and Giles Turner, *'It Can't Be True.' Inside the Semiconductor Industry's Meltdown*, BLOOMBERG, January 8, 2018, https://www.bloomberg.com/news/articles/2018-01-08/-it-can-t-be-true-inside-the-semiconductor-industry-s-meltdown (last accessed January 19, 2018).

the processor guesses the direction of control flow, saves a checkpoint of its register state, and proceeds to speculatively execute the program on the guessed path.  When the value eventually arrives from memory the processor checks the correctness of its initial guess.  If the guess was wrong, the processor discards the (incorrect) speculative execution by reverting the register state back to the stored checkpoint, resulting in performance comparable to idling.  In case the guess was correct, however, the speculative execution results are committed, yielding a significant performance gain as useful work was accomplished during the delay.[15]

24.    As a result of security vulnerabilities in speculative execution, "malicious actors c[an] take advantage of speculative execution to read system memory that should have been inaccessible" and may, as a result, be able to "read sensitive information in the system's memory such as passwords, encryption keys, or sensitive information open in applications" through two similar security vulnerabilities known as "Meltdown" and "Spectre."[16]

25.    The Spectre Defect takes advantage of design defects in AMD processors' use of speculative execution.

26.    The research team from the Graz University of Technology has explained that "Spectre breaks the isolation between different applications" and "allows an attacker to trick error-free programs, which follow best practices, into leaking their secrets."[17]

27.    More specifically, "Spectre attacks involve inducing a victim to speculatively perform operations that would not occur during correct program execution and which leak the victim's confidential information via a side channel to the adversary."[18]  For example, a Spectre attack can "leak information within a browser (such as saved passwords or cookies) to a malicious JavaScript"— which, in turn, sends the passwords or cookies back to the malicious actor.[19]

---

[15]    Paul Kocher, *et al.*, *Spectre Attacks: Exploiting Speculative Execution*, https://spectre attack.com/spectre.pdf (last accessed January 19, 2018) (the "Spectre White Paper").

[16]    Matt Linton, *Today's CPU Vulnerability: What You Need to Know*, GOOGLE SECURITY BLOG, January 3, 2018, https://security.googleblog.com/2018/01/todays-cpu-vulnerability-what-you-need.html (last accessed January 19, 2018).

[17]    Graz University of Technology, *Meltdown and Spectre*.

[18]    Spectre White Paper.

[19]    Peter Bright, *Here's How, and Why, the Spectre and Meltdown Patches Will Hurt Performance*, ARS TECHNICA, January 11, 2018, https://arstechnica.com/gadgets/2018/01/heres-

28.     To date, at least two particular types of Spectre attacks have emerged: "[o]ne version [the "branch prediction variant"] allows an attacker to 'train' the processor's branch prediction machinery so that a victim process mispredicts and speculatively executes code of an attacker's choosing (with measurable side-effects); the other [the "array bounds variant"] tricks the processor into making speculative accesses outside the bounds of an array."[20]

29.     Fixing the Spectre Defect is particularly complicated.  As explained by *Ars Technica*:

> while there may be limited ways to block certain kinds of speculative execution, general techniques that will defend against any information leakage due to speculative execution aren't known.
>
> Sensitive pieces of code could be amended to include 'serializing instructions'—instructions that force the processor to wait for all outstanding memory reads and writes to finish (and hence prevent any speculation based on those reads and writes)—that prevent most kinds of speculation from occurring. . . .  But these instructions would have to be very carefully placed, with no easy way of identifying the correct placement.[21]

As such, "at-risk applications (notably, browsers) are being updated to include certain Spectre mitigating techniques to guard against the array bounds variant" while "[o]perating system and processor updates are needed to address the branch prediction version."[22]  Some sources predict that the Spectre Defect "may be impossible to defend against [ ] entirely in the long term without updating hardware."[23]

---

how-and-why-the-spectre-and-meltdown-patches-will-hurt-performance/ (last accessed January 19, 2018).

[20]     *Id.*

[21]     Peter Bright, *"Meltdown" and "Spectre": Every Modern Processor Has Unfixable Security Flaws*, ARS TECHNICA, January 3, 2018.

[22]     Peter Bright, *Here's How, and Why, the Spectre and Meltdown Patches Will Hurt Performance*, ARS TECHNICA, January 11, 2018.

[23]     Lily Hay Newman, *Meltdown and Spectre Fixes Arrive—But Don't Solve Everything*, WIRED, January 6, 2018.

30.    When *The Register* first reported these security vulnerabilities on January 2, 2018, AMD's initial response was that "there is a near zero risk to AMD processors."[24]  Moreover, AMD maintained that its processors were "not subject to the types of attacks that the kernel page table isolation feature protects against.  The AMD microarchitecture does not allow memory references, including speculative references, that access higher privileged data when running in a lesser privileged mode when that access would result in a page fault."[25]  AMD has since confirmed that its CPUs are, in fact, susceptible to the Spectre Defect.[26]

31.    While AMD has not publicly confirmed whether there will be any performance impacts from applying firmware updates to mitigate the threat of the Spectre Defect, research confirms that current software "patches" or updates that have been issued to combat Spectre have resulted in "corresponding performance slowdowns" given that "the fixes involve routing data for processing in less efficient ways."[27]  Furthermore, Microsoft Corp. has recently confirmed that Spectre-related patches for computers running Windows operating systems with affected processors result in "a performance impact."[28]

32.    In fact, according to *Wired*, on January 9, 2018, "Microsoft paused distribution of its Meltdown and Spectre patches for certain AMD processors after the update bricked [or rendered

---

[24]    Advanced Micro Devices, Inc., *AMD Processors: Google Project Zero, Spectre and Meltdown*, https://www.amd.com/en/corporate/speculative-execution, (last accessed January 19, 2018); *see also* Tom Warren, *AMD Is Releasing Spectre Firmware Updates to Fix CPU Vulnerabilities*, THE VERGE, January 11, 2018, https://www.theverge.com/2018/1/11/16880922/amd-spectre-firmware-updates-ryzen-epyc (last accessed January 19, 2018).

[25]    John Leyden and Chris Williams, *Kernel-memory-leaking Intel Processor Design Flaw Forces Linux, Windows Redesign*, THE REGISTER, January 2, 2018.

[26]    *See* Advanced Micro Devices, Inc., *AMD Processors: Google Project Zero, Spectre and Meltdown*.

[27]    Lily Hay Newman, *Meltdown and Spectre Fixes Arrive—But Don't Solve Everything*, WIRED, January 6, 2018.

[28]    Terry Myerson, *Understanding the Performance Impact of Spectre and Meltdown Mitigations on Windows Systems*, MICROSOFT CORP., January 9, 2018.

CLASS ACTION COMPLAINT                                                                        9

inoperable] some machines" and "Microsoft claims that its patches were flawed because of inaccuracies in AMD's chip documentation."[29]

### C.    Defendant's Knowledge of the Defect

33.    Although the public only became aware of the Spectre Defect in AMD processors in January 2018, AMD has been aware of the Spectre Defect since *at the latest* June 1, 2017, when a team from Google's Project Zero alerted the company to the existence of the Defect.[30]

34.    AMD knew, or should have known, of the Defect in its processors many years ago given that AMD was in a superior position to perform proper tests and security checks of its processors and appropriate due diligence would have revealed the vulnerabilities that were uncovered by various independent teams.  Indeed, Defendant had actual knowledge, and access to proprietary information to discover, that defects in design were causing the Defect in its processors.

35.    As stated succinctly by Paul Kocher, one of the researchers who identified the Spectre Defect, "[t]here's no reason someone couldn't have found this years ago instead of today."[31]

36.    Indeed, warning signs have existed since at least early 2005 when "[r]esearchers began writing about the potential for security weaknesses at the heart of central processing units."[32]  This influential work continued in 2013 when "other research papers showed that CPUs let unauthorized users see the layout of the kernel, a set of instructions that guide how computers perform key tasks like managing files and security and allocating resources."[33]

---

[29]    Lily Hay Newman, *The Hidden Toll of Fixing Meltdown and Spectre*, WIRED, January 12, 2018, https://www.wired.com/story/meltdown-and-spectre-patches-take-toll/ (last accessed January 18, 2018).

[30]    *See* Samuel Gibbs, *Meltdown and Spectre: 'Worst Ever' CPU Bugs Affect Virtually All Computers*, THE GUARDIAN, January 4, 2018.

[31]    *Id.*

[32]    Ian King, *et al.*, *'It Can't Be True': Inside the Semiconductor Industry's Meltdown*, CHICAGO TRIBUNE, January 10, 2018, http://www.chicagotribune.com/bluesky/technology/ct-inside-semiconductor-meltdown-20180110-story.html (last accessed January 19, 2018).

[33]    *Id.*

37.     These early reports ultimately prompted industry presentations at various "Black Hat" and other cybersecurity conferences in 2016 and 2017, including presentations by members of the Graz University team, regarding potential attacks against the kernel memory of CPU processors.[34]

38.     Nevertheless, rather than inform the public about the Spectre Defect, AMD continued to sell its defective processors to unknowing customers at prices much higher than what customers would have paid had they know about the Defect and the impact on processing speeds.

39.     As a result, Plaintiff and members of the Class have been saddled with overpriced processors that are slower and more vulnerable to security risks than what they bargained for.

V.     **TOLLING OF THE STATUE OF LIMITATIONS AND ESTOPPEL**

40.     **Discovery Rule Tolling**.    Plaintiff and members of the Class could not have reasonably discovered through the exercise of reasonable diligence that their AMD processors suffered from major security vulnerabilities that, if mitigated, resulted in reduced processing performance, within the time period of any applicable statute of limitations.

41.     Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a latent defect and/or that the AMD processors contained a defect that exposed them to security vulnerabilities that, if mitigated, resulted in reduced processing performance.

42.     **Fraudulent Concealment Tolling**.    Throughout the time period relevant to this action, Defendant concealed from and failed to disclose to Plaintiff and members of the Class vital information concerning the Defect described herein, despite the fact that Defendant knew, or should have known of, the Defect in its Processors well before its discovery by a third party.

43.     Defendant kept Plaintiff and members of the Class ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiff nor members of the Class could have discovered the Defect, even upon reasonable exercise of diligence.

44.     Despite its knowledge of the Defect, Defendant failed to disclose and concealed, and continues to conceal, critical information relating to the Defect from Plaintiff and members of the

---

[34]     *See id.*

CLASS ACTION COMPLAINT                                                                                    11

Class, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

45.     Plaintiff and members of the Class justifiably relied on Defendant to disclose the Defect in the AMD processors they purchased or leased (either directly or as a component of, among other things, a computer or server), because the Defect was hidden and not discoverable through reasonable efforts by Plaintiff and members of the Class.

46.     Thus, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiff and members of the Class have sustained as a result of the defective AMD processors by virtue of the fraudulent concealment doctrine.

47.     **Estoppel**. Defendant was under a continuous duty to disclose to Plaintiff and members of the Class the true character, quality, and nature of the defective processors and associated security vulnerabilities and reductions in processing performance, but concealed the true nature, quality, and character of the processors.

48.     Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## VI.     CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this proposed action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3) on behalf of the following Class:

> All persons or entities in the United States that purchased or leased one or more AMD processors, or one or more devices containing an AMD processor.

50.     Excluded from the Class are Defendant and any parents, subsidiaries, corporate affiliates, officers, directors, employees, assigns, successors, the Court, Court staff, Defendant's counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to establish subclasses where appropriate.

51.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

1    52.    **Numerosity**.  Federal Rule of Civil Procedure 23(a)(1):  The Class is so numerous
2    that individual joinder of all potential members is impracticable.  Plaintiff believes that there are at
3    least thousands of proposed members of the Class throughout the United States.  Members of the
4    Class may be notified of the pendency of this action by recognized, Court-approved notice
5    dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or
6    published notice.

7    53.    **Commonality and Predominance**.  Federal Rule of Civil Procedure 23(a)(2) and
8    23(b)(3):  This action involves common questions of law and fact, which predominate over any
9    questions affecting individual members of the Class, including, without limitation:

10    A.    Whether Defendant engaged in the conduct alleged herein;

11    B.    Whether Defendant's processors are defective and contain the Spectre Defect;

12    C.    Whether the purported "patches," "fixes," or other remedies are ineffective
13    and/or result in reduced processing performance;

14    D.    Whether any such reduced processing performance is material;

15    E.    Whether Defendant knew, or should have known, that its processors were
16    defective and that, if mitigated, resulted in reduced processing performance;

17    F.    Whether Defendant had a duty to disclose, and breached its duty to disclose,
18    that its processors were defective and that, if mitigated, resulted in reduced
19    processing performance;

20    G.    Whether Defendant intentionally, recklessly, or negligently misrepresented or
21    omitted material facts including the fact that its processors are defective and
22    that, if mitigated, resulted in reduced processing performance;

23    H.    Whether Defendant breached its express warranties in that its processors were
24    defective with respect to manufacture, workmanship, and/or design;

25    I.    Whether Defendant breached its implied warranties in that its processors were
26    defective with respect to manufacture, workmanship, and/or design;

27    J.    Whether Defendant violated the Magnuson-Moss Warranty Act, 15 U.S.C. §
28    2301, *et seq.*;

K.  Whether Defendant was unjustly enriched by the conduct alleged herein;

L.  Whether Defendant violated California's Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*;

M.  Whether Defendant violated California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq.*;

N.  Whether Plaintiff and members of the Class overpaid for AMD Processors;

O.  Whether Plaintiff and members of the Class are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

P.  Whether Plaintiff and members of the Class are entitled to damages and other monetary relief and, if so, in what amount.

54.  **Typicality**.  Federal Rule of Civil Procedure 23(a)(3):  Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all members of the Class were comparably injured through Defendant's wrongful conduct as described above.

55.  **Adequacy**.  Federal Rule of Civil Procedure 23(a)(4):  Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and its counsel.

56.  **Declaratory and Injunctive Relief**.  Federal Rule of Civil Procedure 23(b)(2):  Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

57.  **Superiority**.  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's

1  wrongful conduct. Even if members of the Class could afford individual litigation, the court system

2  could not. Individualized litigation creates a potential for inconsistent or contradictory judgments,

3  and increases the delay and expense to all parties and the court system. By contrast, the class action

4  device presents far fewer management difficulties, and provides the benefits of single adjudication,

5  economy of scale, and comprehensive supervision by a single court

6  **VII.    CLAIMS FOR RELIEF**

7  <u>**COUNT I**</u>

8  <u>**BREACH OF IMPLIED WARRANTY**</u>

9  58.    Plaintiff incorporates and realleges each preceding paragraph as though fully set forth

10  herein.

11  59.    Plaintiff brings this count on behalf of herself and the Class.

12  60.    Plaintiff and members of the Class purchased or leased AMD processors, or devices

13  containing AMD processors, from Defendant, by and through Defendant's authorized agents for retail

14  sales, or were otherwise expected to be the eventual purchasers or lessors of AMD processors when

15  purchased or leased from a third party. At all relevant times, Defendant was the manufacturer,

16  distributor, warrantor, and/or seller of the relevant processors. Defendant knew or had reason to know

17  of the specific use for which its processors were purchased or leased.

18  61.    Defendant is and at all relevant times was a "merchant" and seller of "goods" (*i.e.*,

19  AMD processors) as defined under the Uniform Commercial Code.

20  62.    AMD processors are and were at all relevant times "goods" within the meaning of the

21  Uniform Commercial Code.

22  63.    Pursuant to U.C.C. § 2-314, an implied warranty that goods are merchantable is

23  implied in every contract for a sale of goods. Defendant impliedly warranted that its processors were

24  in merchantable condition and fit for the ordinary purpose for which AMD processors are used.

25  64.    AMD processors, when sold or leased and at all times thereafter, were not in

26  merchantable condition and are not fit for the ordinary purpose due to the Spectre Defect, and the

27  associated problems and failures caused by the Spectre Defect. Thus, Defendant breached its implied

28  warranty of merchantability.

65.     As a direct and proximate result of Defendant's breach of its implied warranty of merchantability, Plaintiff and members of the Class have been damaged in an amount to be proven at trial.

66.     Defendant cannot disclaim its implied warranties as it knowingly sold or leased a defective product.

67.     Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Spectre Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the Spectre Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Spectre Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

68.     Any attempt by Defendant to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Spectre Defect.  The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class.  Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

69.     Further, as manufacturers of consumer goods, Defendant is precluded from excluding or modifying an implied warranty of merchantability or limiting customers' remedies for breach of this warranty.

70.    Plaintiff and members of the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

71.    Defendant's warranties were designed to influence consumers who purchased its processors, including products that contain them.

72.    Defendant is estopped by its conduct, as alleged herein, from disclaiming any and all implied warranties with respect to the defective processors.

73.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule, concealment, and the terms of the express warranty.

## COUNT II

## BREACH OF EXPRESS WARRANTY

74.    Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

75.    Plaintiff brings this count on behalf of herself and members of the Class.

76.    Defendant marketed its processors as secure and of particular processing speeds.  Such representations formed the basis of the bargain in Plaintiff's and members of the Class's decisions to purchase or lease AMD processors, or devices containing AMD processors.

77.    Pursuant to U.C.C. § 2-313, an affirmation of fact, promise, or description made by the seller to the buyer which relates to the goods and becomes a part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation, promise, or description.

78.    Defendant is and was at all relevant times a "merchant" and seller of "goods" (*i.e.*, AMD processors) as defined under the Uniform Commercial Code.

79.    AMD processors are and were at all relevant times "goods" within the meaning of the Uniform Commercial Code.

80.    Defendant represented that its processors were secure and of particular processing speeds.  AMD processors were not secure—given that they were subject to the Spectre Defect—and did not operate at stated processing speeds given that patches necessary to mitigate the Spectre Defect result in reduced processing performance.

CLASS ACTION COMPLAINT                                                                                          17

81.     Plaintiff and members of the Class experienced the existence of the Spectre Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Spectre Defect, which was known and concealed by Defendant.

82.     Plaintiff and members of the Class could not have reasonably discovered the Spectre Defect in AMD processors prior to the public disclosure of the Spectre Defect by cybersecurity experts or prior to experiencing a known security hack resulting from the Spectre Defect.

83.     Defendant breached the express warranty by selling AMD processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

84.     AMD processors were not of merchantable quality and were unfit for the ordinary purposes for which AMD processors are used because of the existence of the Spectre Defect, and do not perform as warranted.

85.     Defendant was provided notice of the Spectre Defect by independent research teams, and knew, or should have known, of the existence of the Spectre Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Spectre Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Spectre Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

86.     Any attempt by Defendant to disclaim or limit the express warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Spectre Defect.  The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class.  Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were

defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

87.    Defendant knew that its processors were inherently defective and did not conform to their warranties and Plaintiff and members of the Class were induced into purchasing or leasing AMD processors, or devices containing AMD processors, under false pretenses.

88.    Plaintiff and members of the Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

89.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Class have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced processor speeds, diminished value of their computer devices, and loss of use of or access to their computer devices.

## COUNT III

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT ("MMWA")

## 15 U.S.C. § 2301, *ET SEQ*.

90.    Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

91.    Plaintiff brings this count on behalf of herself and the Class.

92.    Plaintiff satisfies the MMWA's jurisdictional requirement because this action satisfies the diversity jurisdiction requirements under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

93.    Plaintiff and members of the Class are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

94.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

95.    AMD's processors are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

96.    The MMWA, 15 U.S.C. § 2310(d)(1), provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

97.    Defendant provided Plaintiff and members of the Class with one or more express warranties, which are covered under the MMWA, 15 U.S.C. § 2301(6).  In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant directly provided warranty coverage for its processors, or indirectly provided warranty coverage for its processors under one or more manufacturer's warranties.

98.    Plaintiff and members of the Class experienced the existence of the Spectre Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Spectre Defect, which was known and concealed by Defendant, and have not been provided a suitable repair or replacement of the defective processors free of charge within a reasonable time.

99.    Defendant provided Plaintiff and members of the Class with one or more implied warranties, which are covered under the MMWA, 15 U.S.C. § 2301(7).

100.    In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant breached these warranties by misrepresenting the standard, quality, or grade of its processors, and failing to disclose and fraudulently concealing the existence of the Defect in its processors.  AMD processors share a common defect in design, workmanship, and manufacture that is prone to security vulnerabilities and fails to operate as represented by Defendant.

101.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Spectre Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of warranties would be unnecessary and futile here because Defendant has known of and concealed the Spectre Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Spectre Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

102.   Any attempt by Defendant to disclaim or limit its express or implied warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class.  Among other things, Plaintiff and members of the Class did not determine these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendant and members of the Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance

103.   Plaintiff and members of the Class would suffer economic hardship if they returned their AMD processors, or devices containing the AMD processors, but did not receive the return of all payments made by them to Defendant.  Thus, Plaintiff and members of the Class have not re-accepted their AMD processors by retaining them.

104.   The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

105.   Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law, including diminution in the value of the AMD processors, in an amount to be proven at trial.

## COUNT IV

## NEGLIGENCE

106.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

107.   Plaintiff brings this count on behalf of herself and the Class.

108.   Defendant owed a duty of care to Plaintiff and members of the Class, arising from the sensitivity of information stored on computers and the foreseeability of the impact of the Spectre Defect on data security, to exercise reasonable care in safeguarding sensitive information.

109.    Defendant also had a duty to ensure that its processors would function at the quality and processing speeds that it represented to customers, including Plaintiff and members of the Class. This duty included, *inter alia*, designing, maintaining, monitoring, and testing its processors to ensure that members of the Class's data and computers were adequately secured and that its processors would function as promised.

110.    Defendant owed a duty to Plaintiff and members of the Class to implement processes that would detect major security vulnerabilities, such as the Spectre Defect, in a timely manner.

111.    Defendant also owed a duty to disclose the material fact that its processors were defective.

112.    But for Defendant's breach of its duties, Plaintiff and members of the Class would not have purchased or leased—or would have paid substantially less for—AMD processors (or devices containing AMD processors) had they known of the Spectre Defect and the reduction in processing performance associated with efforts necessary to mitigate the substantial security risks presented by the Spectre Defect.

113.    Plaintiff and members of the Class were foreseeable victims of Defendant's wrongdoing, and Defendant knew, or should have known, that its processors would cause damages to Plaintiff and members of the Class.

114.    As a direct and proximate result of Defendant's negligence, Plaintiff and members of the Class have been damaged in an amount to be proven at trial, including, but not limited to, compensatory damages, incidental and consequential damages, and other damages allowed by law.

## **COUNT V**

## **UNJUST ENRICHMENT**

115.    Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

116.    Plaintiff brings this count on behalf of herself and members of the Class.

117.    Plaintiff and members of the Class conferred a benefit on Defendant by purchasing or leasing AMD processors, or devices containing AMD processors.  Defendant was and should have been reasonably expected to provide its processors free from the Spectre Defect.

118.   Defendant unjustly profited from the sale and lease of AMD processors, or devices containing AMD processors, at inflated prices as a result of its materially deceptive advertising, marketing, false representations, omissions, and concealment of the Defect in its processors.

119.   As a proximate result of Defendant's materially deceptive advertising, marketing, false representations, omissions, and concealment of the Spectre Defect, and as a result of Defendant's ill-gotten gains, benefits, and profits, Defendant has been unjustly enriched at the expense of Plaintiff and members of the Class because AMD processors did not provide the represented benefits.  It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiff and members of the Class.

120.   There is privity between Defendant and Plaintiff and members of the Class because Defendant intended customers, such as Plaintiff and members of the Class, to be the purchasers or lessors of AMD processors, or devices containing AMD processors.

121.   Plaintiff and members of the Class are entitled to restitution of the amount of Defendant's ill-gotten gains, benefits, and profits, including interest, resulting from their unlawful, unjust, and inequitable conduct.

122.   Plaintiff and members of the Class seek an order requiring Defendant to disgorge its gains and profits to Plaintiff and members of the Class, together with interest, in a manner to be determined by the Court.

### COUNT VI

### VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT ("CLRA")

### California Civil Code § 1750, *et seq.*

123.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

124.   Plaintiff brings this count on behalf of herself and members of the Class.

125.   California Civil Code § 1750, *et seq.*, the CLRA, "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

CLASS ACTION COMPLAINT                                                                 23

126.    Plaintiff and members of the Class are "consumers" within the meaning of the CLRA, California Civil Code §1761(d).

127.    Defendant is a "person" within the meaning of the CLRA, California Civil Code §1761(c).

128.    AMD's processors are "goods" within the meaning of the CLRA, California Civil Code §1761(a).

129.    Plaintiff and members of the Class's purchase or lease of AMD processors, or devices containing AMD processors, are "transactions" within the meaning of the CLRA, California Civil Code §1761(e).

130.    Defendant violated the CLRA by misrepresenting the performance and security capabilities and features of its processors, and failing to disclose and fraudulently concealing the existence of the Defect in its processors.  As such, Defendant violated the CLRA by:

    a.    "Representing that goods . . . have . . . characteristics, . . . uses, [and] benefits . . . that they do not have" (California Civil Code §1770(a)(5));

    b.    "Representing that goods . . . are of a particular standard, quality, or grade" (California Civil Code §1770(a)(7));

    c.    "Advertising goods . . . with intent not to sell them as advertised" (California Civil Code §1770(a)(9)); and

    d.    "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not" (California Civil Code §1770(a)(16)).

131.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Spectre Defect much earlier.  Nevertheless, Defendant failed to disclose and fraudulently concealed the existence of the Defect in its processors.  Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiff and members of the Class, but failed to do so.

132.    Defendant's deceptive conduct was likely to deceive a reasonable consumer, and did in fact deceive reasonable consumers including Plaintiff and members of the Class.

133.   Defendant's unlawful acts and practices affect the public interest and trade and commerce in the State of California, and present a continuing risk to Plaintiff and members of the Class.

134.   Defendant's violations of the CLRA were willful and oppressive.

135.   As a result of Defendant's deceptive conduct, Plaintiff and members of the Class have been injured.  Plaintiff and members of the Class are entitled to, *inter alia*, injunctive relief, costs, attorneys' fees, and other such relief the Court deems appropriate, just, and equitable, in amounts to be determined at trial.

136.   With this filing, and on this Count, pursuant to California Civil Code §1782(d), Plaintiff seeks an order enjoining the above-described unfair and deceptive practices.

137.   Plaintiff has provided Defendant with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a).  The notice, attached hereto as Exhibit A, is being transmitted to Defendant contemporaneously with the filing of this complaint.  Plaintiff reserves the right to, upon the expiration of thirty days from the date of mailing the notice, amend this complaint to include a request for damages under the CLRA.

## COUNT VII

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")
## CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*

138.   Plaintiff incorporates and realleges each preceding paragraph as though fully set forth herein.

139.   Plaintiff brings this count on behalf of herself and members of the Class.

140.   California Business & Professions Code § 17200, *et seq.*, the UCL, prohibits "any unlawful, unfair or fraudulent business act or practice."

141.   At all relevant times, Defendant has maintained substantial operations in, regularly conducted business throughout, and engaged in the conduct described herein within the State of California.

142.   Defendant, in connection with the Spectre Defect, has engaged in unfair, unlawful, and fraudulent business acts and practices in violation of the UCL in that: (1) Defendant's conduct is

immoral, unethical, oppressive, unconscionable, and substantially harmful to Plaintiff and members of the Class; (2) any justification for Defendant's conduct would be outweighed by the gravity of the injury to Plaintiff and members of the Class; (3) Defendant's conduct violates the common law, the MMWA, and the CLRA; and (4) Defendant's conduct deceived and defrauded Plaintiff and members of the Class.

143.    Defendant's unfair, unlawful, and fraudulent business practices were likely to deceive a reasonable consumer.  Plaintiff and members of the Class used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

144.    As a result of Defendant's systematic unlawful, unfair, and fraudulent conduct, Plaintiff and members of the Class have been injured.  The harm caused by this conduct vastly outweighs any legitimate business utility it possibly could have.  Plaintiff and members of the Class are entitled to restitution, including disgorgement of profits, costs, and attorneys' fees in amounts to be determined at trial.

145.    Defendant's conduct is or may well be continuing and ongoing.  Accordingly, Plaintiff and members of the Class are entitled to injunctive relief to prohibit or correct such ongoing acts of unfair competition, in addition to obtaining equitable monetary relief.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully request that this Court enter judgment against Defendant and in favor of Plaintiff and the Class, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class, and Plaintiff's counsel as counsel for the Class;

B.    An order awarding declaratory relief and enjoining Defendant from continuing the unlawful, deceptive, harmful, and unfair business conduct and practices alleged herein;

C.    Appropriate injunctive and equitable relief;

D.   A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

E.   Costs, restitution, damages, including statutory and punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.   An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

G.   An award of costs and attorneys' fees; and

H.   Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED: January 19, 2018                    Respectfully submitted,

**KESSLER TOPAZ MELTZER
  & CHECK, LLP**

*/s/ Eli R. Greenstein*
ELI R. GREENSTEIN (Bar No. 217945)
egreenstein@ktmc.com
JENNIFER L. JOOST (Bar No. 296164)
jjoost@ktmc.com
STACEY M. KAPLAN (Bar No. 241989)
skaplan@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:  (415) 400-3000
Fax: (415) 400-3001

-and-

JOSEPH H. MELTZER
jmeltzer@ktmc.com
SAMANTHA HOLBROOK
sholbrook@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax: (610) 667-7056

**ROBBINS GELLER RUDMAN
& DOWD LLP**
STUART A. DAVIDSON
sdavidson@rgrdlaw.com
CHRISOPHER C. GOLD
cgold@rgrdlaw.com
RICARDO J. MARENCO
rmarenco@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel:  (561) 750-3000
Fax:  (561) 750-3364

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
JAMES E. CECCHI
jcecchi@carellabyme.com
5 Becker Farm Road
Roseland, NJ 07068
Tel:  (973) 994-1700
Fax:  (973) 994-1744

**SEEGER WEISS LLP**
CHRISTOPHER A. SEEGER
cseeger@seegerweiss.com
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel:  (973) 639-9100
Fax:  (973) 639-9393

*Attorneys for Plaintiff Diana Hauck*