1   **KESSLER TOPAZ**                         **ROBBINS GELLER RUDMAN**
      **MELTZER & CHECK, LLP**                 **& DOWD LLP**
2   JENNIFER L. JOOST (Bar No. 296164)        ROBERT M. ROTHMAN (*Pro Hac Vice*)
    jjoost@ktmc.com                           rrothman@rgrdlaw.com
3   One Sansome Street, Suite 1850            58 South Service Road, Suite 200
    San Francisco, CA  94104                  Melville, NY 11747
4   Tel: (415) 400-3000                       Tel: (631) 367-7100
    Fax: (415) 400-3001                       Fax: (631) 367-1173
5
    -and-                                     -and-
6
    JOSEPH H. MELTZER (*Pro Hac Vice*)        STUART A. DAVIDSON (*Pro Hac Vice*)
7   jmeltzer@ktmc.com                         sdavidson@rgrdlaw.com
    SAMANTHA HOLBROOK (*Pro Hac Vice*)        120 East Palmetto Park Road, Suite 500
8   sholbrook@ktmc.com                        Boca Raton, FL 33432
    280 King of Prussia Road                  Tel:  (561) 750-3000
9   Radnor, PA 19087                          Fax: (561) 750-3364
    Tel: (610) 667-7706
10  Fax: (610) 667-7056

11  *Interim Co-Lead Counsel for Plaintiffs and the Class*

12

13               **UNITED STATES DISTRICT COURT**

14             **NORTHERN DISTRICT OF CALIFORNIA**

15                    **SAN JOSE DIVISION**

16

17  DIANA HAUCK, et al.,                      Civil Action No. 18-CV-00447-LHK

18                    Plaintiff,              **CONSOLIDATED CLASS ACTION**
                                              **COMPLAINT**
19         v.
                                              **DEMAND FOR JURY TRIAL**
20  ADVANCED MICRO DEVICES, INC.,

21                    Defendant.

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ...............................................................................................................7

        A.      Plaintiffs ....................................................................................................7

        B.      Defendant ..................................................................................................9

III.    JURISDICTION AND VENUE ..........................................................................10

IV.     FACTUAL ALLEGATIONS ..............................................................................10

        A.      CPUs, Speculative Execution, and Branch Prediction .............................11

        B.      The Speed Wars........................................................................................12

        C.      AMD Heavily Relied Upon Speculative Execution and Branch Prediction
                to Achieve Advertised CPU Clock Speed ..................................................14

        D.      AMD's Processors Are Defective ..............................................................18

        E.      AMD's Knowledge of the CPU's Vulnerability to Side-Channel Attacks ...............21

        F.      AMD's Knowledge of Spectre Variants 1 and 2.........................................26

        G.      Spectre "Patches" Are Inadequate and Materially Impact CPU
                Performance Once Installed ......................................................................27

        H.      Defendant's Attempts to Limit and Disclaim Warranties are
                Unconscionable ........................................................................................31

V.      TOLLING OF THE STATUE OF LIMITATIONS AND ESTOPPEL................32

VI.     CLASS ACTION ALLEGATIONS.....................................................................34

VII.    CLAIMS FOR RELIEF.......................................................................................37

VIII.   PRAYER FOR RELIEF......................................................................................98

IX.     DEMAND FOR JURY TRIAL ...........................................................................98

1    Plaintiffs Diana Hauck, Shon Elliott, Michael Garcia, JoAnn Martinelli, Benjamin D. Pollack,

2    and Jonathan Caskey-Medina (collectively "Plaintiffs"), individually, and on behalf of all others

3    similarly situated, hereby allege the following based on personal knowledge as their own conduct,

4    and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.    This case concerns Defendant Advanced Micro Devices, Inc.'s ("Defendant," "AMD," or the "Company") violations of state common law and state and federal statutory law with respect to the manufacture and sale of central processing units ("CPUs" or "processors") for more than 20 years with serious security vulnerabilities (the "Defect"), which allows hackers to steal sensitive data from the most secure area of the CPU.  AMD's focus on the CPU's speed, at the expense of security, led Plaintiffs and the Classes (as defined herein) to purchase or lease these processors, or devices containing these processors, without the knowledge that the Defect left their most sensitive data, including passwords, social security numbers, and credit card information, stored within the device's memory vulnerable to malware attacks, and without the knowledge that attempts to patch the Defect would result in a degradation of the CPU's advertised performance, including clock speed.

2.    The Defect is the result of AMD's reliance on microarchitectural optimization techniques supporting "out-of-order" execution, including "speculative execution" and "branch prediction," to design, manufacture, and ultimately sell to the consuming public, CPUs with ever-increasing processing and performance speed.  Without speculative execution and branch prediction, AMD's CPUs are unable to reach advertised speeds.  However, CPUs that rely on speculative execution and branch prediction put consumers' most sensitive information at risk, a fact that AMD has been aware of for many year

3.    CPUs are the "brains" of the device they power.  Processors fetch, decode, and execute instructions from software programs or applications (*e.g.*, opening a Microsoft Word document). Prior to 1995, AMD processors fetched, decoded, and executed instructions one at a time, in program order, leaving CPUs idle much of the time.  To better harness the performance potential of CPUs, AMD introduced a new architecture in 1995, known as "K5."

4.      K5 improved upon earlier-generation AMD architectures in three significant ways. *First*, K5 allowed the processor to fetch, decode, and execute several instructions in parallel—a so-called "superscalar" design—thereby improving the peak instruction throughput of the system. *Second*, K5 allowed instructions to be executed in an order subject to data dependencies, rather than the original order specified in the program—a so-called "out-of-order" design.  This allowed the processor to perform useful work during otherwise idle (and therefore wasted) cycles.  *Third*, K5 allowed the processor to predict the path that the program would follow ahead of the execution of "branch" instructions—an optimization technique called "branch prediction"—and to speculatively execute instructions along the predicted path in order to reduce the cost of branch instructions—known as "speculative execution."

5.      In high-speed CPUs, a single cycle or "clock" period is not long enough to process an individual instruction in its entirety.  Instead, the processor breaks each instruction into a series of simple steps (*e.g.*, fetch, decode, and execute) called "pipeline stages," each of which takes one clock cycle to complete.  Successive instructions flow through consecutive pipeline stages one after another, similar to how manufactured goods flow through an assembly line on a factory floor.

6.      When the processor runs into a "branch instruction," the purpose of which is to decide which instruction to process next, this steady flow of instructions through the pipeline is interrupted, slowing down the processor.  Speculative execution allows the processor to ***predict*** the result of the branch instruction, and ***speculatively execute*** instructions further down the predicted path.  When the processor eventually executes the branch instruction, the processor checks whether its prediction was correct.  If the CPU guessed correctly, the processor has performed useful work by speculatively executing the instructions down the predicted path and the results are written to memory.  If the CPU guessed incorrectly, however, the processor "flushes" its pipeline of the instructions it speculatively executed and proceeds to execute the instructions from the correct path.  Speculative execution is necessary to keep a high-speed CPU busy with useful instructions.  Without speculative execution, most modern CPUs—including those designed, manufactured, and sold by AMD—cannot operate at GHz clock rates or frequencies.

7.     Because there is a danger that the CPU will incorrectly predict the result of a branch instruction, speculative instructions are not allowed to overwrite data stored in the processor's cache memory.[1]  Nevertheless, speculative instructions *are* permitted to read data, including "privileged information," from main memory, causing such data to be brought inside the CPU's caches.  If the speculative instructions are not on the correct path, then the CPU prevents communication of the data, including "privileged" information, to the outside world by flushing the pipeline.

8.     Speculative execution and branch prediction led to significant increases in the CPU's clock speed or rate, also known as its "frequency."  Beginning in 1995, and continuing until today, AMD disclosed the specifications for each and every processor it manufactured and sold.  These specifications included the base and max clock speed.  AMD also routinely touted gains in clock speed when advertising its CPU architecture and processors to consumers.  This at times myopic focus on clock speed led to several battles between AMD and its biggest competitor, Intel Corporation ("Intel"), known within the industry as the "Megahertz" and "Gigahertz" wars.

9.     By 2003, CPU manufacturers had hit a wall with respect to clock speed.  While CPUs had become incredibly fast due to complex superscalar designs and reliance on out-of-order execution, speculative execution, and branch prediction, the memory subsystem—which stores the instructions and data necessary for a computer, laptop, or server to function—was considerably slower than the CPU.  In a 1996 article for the *Microprocessor Report*, called "It's The Memory, Stupid!," a CPU architect presciently noted: "today's chips are largely able to execute code faster than we can feed them with instructions and data. . . . The real design action is in memory subsystems – caches, buses, bandwidth, and latency."

10.     As a result, AMD began to address memory latency by putting greater amounts of cache memory on the same die as the CPU itself.  AMD progressively increased both the number and the sizes of these on-chip caches, allowing the processor to buffer more instructions and data on-chip, where the data could be served faster when the processor needed it.  AMD also imbued its processors

---

[1]     "Cache memory, also called Cache, [is] a supplementary memory system that temporarily stores frequently used instructions and data for quicker processing by the central processor of a computer."  Cache memory, ENCYCLOPEDIA BRITTANICA, https://www.britannica.com/technology/cache-memory (last visited June 12, 2018). Throughout this Complaint, all emphasis is added unless otherwise noted.

with greater intelligence to predict and speculatively execute instructions to better, as AMD's Chief Technology Officer, Mark Papermaster, described it, "feed the beast." AMD publicly touted these efforts to consumers, emphasizing the impact of these components on its CPUs' processing speeds. However, at no time did AMD disclose that the increased reliance of its CPUs on speculative execution and branch prediction to reach the advertised clock speeds exposed consumers to the Defect.

11.    At the same time, researchers began focusing their efforts on security vulnerabilities present in computer hardware, including side channel attacks on processors and, in particular, side channel attacks on the CPU's cache subsystem. The purpose of a side-channel attack is to make inferences regarding secret information stored on a computer system by monitoring the interaction of the CPU with its physical environment (*e.g.*, the amount of time it takes to access data stored in the caches). This information can then be used to reconstruct and recover sensitive data to which an attacker otherwise would not have access.

12.    In August 2014, AMD participated in a security-focused tutorial at an industry conference known as "Hot Chips 26" to discuss hardware security following large-scale software attacks, Stuxnet and Heartbleed. During AMD's portion of the presentation, Leendert Van Doorn ("Van Doorn"), an AMD Corporate Fellow, identified "side channel attacks" on hardware as "*a very rich area of attack and very hard to protect against*," noting in his slides that protecting against side channel attacks was "expensive." In remarks at the end of the Hot Chips 26 security tutorial, Dr. Ruby B. Lee ("Dr. Lee"), a researcher at Princeton University, confirmed that "the crown jewels," *e.g.*, sensitive data, are "vulnerable to side-channel attacks on hardware, especially software side-channel attacks on hardware caches." She observed, "*All current processors with caches are vulnerable – from embedded devices to cloud servers*."

13.    Despite AMD's knowledge that its processors possessed this security vulnerability, AMD did nothing to address it in its CPU architecture or its CPUs. Instead, AMD continued to sell its defective processors to consumers because the cost of tackling the Defect head-on was too great for AMD in a number of ways, including: (i) the likely material impact on processing speed of restricting speculative execution and branch prediction; (ii) the cost to fix legacy processors; and (iii)

the expense of re-designing and manufacturing new architecture and processors that did not have the Defect.  Moreover, the inability to design and manufacture secure high-speed CPUs that were competitive with respect to clock speed would inure to the benefit of AMD's chief rival, Intel.  As a result, AMD did nothing to alert consumers or fix the Defect, allowing AMD to generate tens of billions of dollars in revenues from the sale of defective processors to consumers who did not know that they were sacrificing security for clock speed.

14.     Then, in June 2017, several researchers independently identified and disclosed to AMD and other processor manufacturers the first of four known ways to exploit the Defect in AMD's processors, all of which are collectively known as "Spectre."  In the simplest type of Spectre attack, the attacker exploits security vulnerabilities that exist as a result of CPU's reliance on "speculative execution."  To exploit a high-speed CPU's speculative execution capability, an attacker writes a piece of malicious code that causes the processor to "mispredict" the result of a branch instruction, inducing the CPU to speculatively execute instructions that it otherwise would not execute.  It is these speculative instructions, executed on the mispredicted path, that leak the information that the attacker is then able to recover.

15.     Depending on the contents of the secret information, the speculative instructions on the mispredicted path cause different blocks of data to be brought in from main memory to the CPU's cache subsystem.  Critically, while the processor flushes its pipeline when it discovers that it has speculatively executed instructions down a mispredicted path, the CPU **does not flush the cache subsystem** of data related to those speculative instructions.  As such, the hacker can utilize a cache-timing side channel attack to ultimately gain access to sensitive information, such as passwords or bank account information, without the requisite permissions ever being checked.

16.     Thus, by no later than June 2017, AMD not only knew about the Defect but had evidence clearly demonstrating how it could be exploited by hackers.  Despite this, AMD not only failed to alert consumers who had purchased legacy processors impacted by the Defect, but it continued to sell defective processors to consumers, generating $1.64 billion in revenue between July 1, 2017 and December 31, 2017 in its Computing and Graphics segment.  Indeed, during a November 28, 2017 appearance at the Credit Suisse 21st Annual Technology, Media, & Telecom Conference,

AMD's CEO, Lisa Su, touted AMD's "value proposition," as "extremely good," given AMD's processors "performance" and "performance-per-dollar," and noted: "[w]e just went through Black Friday here in North America, and we had a very, very strong showing." In fact, AMD was "often 3 out of the top 5 or 6 out of the top 10 sellers over the weekend" and had begun to "ramp[] desktop OEM" sales "in the holiday season."

17.   The existence of the Defect and the ways to exploit it (Spectre) were first publicly disclosed in early January 2018, when *The Register* reported that certain Intel processors contained a defect, exposing them to Spectre and another exploit known as "Meltdown." In a January 4, 2018 article titled, "Nearly Every Computer Made Since 1995 Is Dangerously Flawed. Here's What You Need to Know," the author underscored the materiality of the Defect: "Spectre exploits can be used by malicious users to get at sensitive data stored in the memory of other running programs – everything from passwords and credit card information to emails and photographs. And unlike traditional malware which operates like an application, kernel exploits [*e.g.*, Spectre] can't be seen by antivirus software or in system logs."

18.   Initially, AMD attempted to shape the narrative regarding Spectre and a related exploit known as "Meltdown" as an "Intel Only" problem. However, AMD was soon forced to admit that all of its processors had the Defect and could be exploited through Spectre.

19.   Following the public unmasking of the Defect, AMD began to roll out "patches" to prevent hackers from using the Defect to obtain sensitive data through a Spectre exploit. Spectre, however, is difficult to "patch." As reported by *Wired* on January 6, 2018, the patches that have been rolled out or made available to consumers to prevent a much more insidious attack have resulted in "corresponding performance slowdowns" because the patches require the CPUs to "rout[e] data for processing in less efficient ways." Initial estimates have suggested that software patches intended to mitigate Spectre may reduce processing speed by as much as thirty percent and Microsoft Corp. has recently confirmed that Spectre-related patches for computers running Windows operating systems with affected processors result in "a performance impact."

20.   In May 2018, two new Spectre exploits were disclosed, both of which take advantage of the Defect in AMD's processors and require additional patches. Researchers fully expect the

discovery and publication of further exploits of the Defect, lending credence to the assessment of the researchers who first identified the exploits that Spectre will "haunt" the industry for some time.

## II.   PARTIES

### A.   Plaintiffs

21.     Plaintiff Diana Hauck is a resident and citizen of the State of Louisiana.  On November 4, 2016, Ms. Hauck purchased an HP 15-ba079dc Notebook computer, containing an AMD A10-9600P processor, for $349.99, at the Best Buy in Metairie, Louisiana located at 6205 Veterans Boulevard.  The AMD processor's specifications, including its clock speed or frequency, were prominently displayed next to an in-store sample of the computer.  According to these specifications, the AMD A10-9600P processor had an advertised base clock speed or frequency of 2.4 GHz and a max boost clock speed or frequency of 3.3 GHz.  At the time of her purchase, Ms. Hauck relied on AMD's representations that the AMD processor would perform as advertised and was not defective. Had Ms. Hauck been aware of the Defect or that Spectre could be used to exploit the Defect and access sensitive information, and that patching the Defect would result in a degradation of the CPU's advertised performance, she would not have purchased the computer, or paid substantially less for her computer.

22.     Plaintiff Shon Elliott is a resident and citizen of the State of California.  Mr. Elliott is a longtime customer of AMD processors.  Between 2005 and 2016, Mr. Elliott purchased several AMD processors, four of which are in computers or servers.  On April 21, 2016, Mr. Elliott purchased an AMD FX 8370 processor with Wraith cooler at the Fry's Electronics ("Fry's") in Sunnyvale, California, for $157.50.  The AMD processor's specifications, including its clock speed or frequency, were prominently displayed on the box and on the receipt.  According to these specifications, the AMD FX 8370 processor had an advertised base clock speed or frequency of 4.0 GHz and a max boost clock speed or frequency of 4.3 GHz.  At the time of his purchase, Mr. Elliott relied on AMD's representations that the AMD processor would perform as advertised and was not defective.  Had Mr. Elliott been aware of the Defect or that Spectre could be used to exploit the Defect and access sensitive information, and that patching the Defect would result in a degradation of the CPU's

advertised performance, he would not have purchased his processors, or paid substantially less for his processors.

23.     Plaintiff Michael Garcia is a resident and citizen of the State of California.  On April 21, 2016, Mr. Garcia purchased an AMD FX 8370 processor with Wraith cooler at Fry's in Sunnyvale, California.  The AMD processor's specifications, including its clock speed or frequency, were prominently displayed on the box and on the receipt.  According to these specifications, the AMD FX 8370 processor had an advertised base clock speed or frequency of 4.0 GHz and a max boost clock speed or frequency of 4.3 GHz.  At the time of his purchase, Mr. Garcia relied on AMD's representations that the AMD processor would perform as advertised and was not defective.  Had Mr. Garcia been aware of the Defect or that Spectre could be used to exploit the Defect and access sensitive information, and that patching the Defect would result in a degradation of the CPU's advertised performance, he would not have purchased his processors, or paid substantially less for his processors.

24.     Plaintiff Joann Martinelli is a resident and citizen of the State of California.  On July 6, 2013, Ms. Martinelli purchased an HP Pavilion p7-1534, containing an AMD A8-5500 processor, for $532.11 at a Best Buy in Auburn, California, located at 1760 Grass Valley Highway.  The AMD processor's specifications, including its clock speed or frequency, were prominently displayed next to an in-store sample of the computer.  According to these specifications, the AMD A8-5500 processor had an advertised clock speed or frequency of 3.2 GHz and a max boost clock speed or frequency of 3.7 GHz.  At the time of her purchase, Ms. Martinelli relied on AMD's representations that the AMD processor would perform as advertised and was not defective.  Had Ms. Martinelli been aware of the Defect or that Spectre could be used to exploit the Defect and access sensitive information, and that patching the Defect would result in a degradation of the CPU's advertised performance, she would not have purchased the computer, or paid substantially less for her computer.

25.     Plaintiff Benjamin D. Pollack is a resident and citizen of the State of Florida.  On September 26, 2014, Mr. Pollack purchased an AMD A10-7850K processor for his personal computer on Newegg.com.  The AMD processor's specifications, including its clock speed or frequency, were prominently displayed on the webpage where he added the processor to his shopping cart, on the

receipt, and on the box which he later received.  According to these specifications, the AMD A10-7850K processor had an advertised base clock speed or frequency of 3.7 GHz and a max boost clock speed or frequency of 4.0 GHz.  At the time of his purchase, Mr. Pollack relied on AMD's representations that the AMD processor would perform as advertised and was not defective.  Had Mr. Pollack been aware of the Defect or that Spectre could be used to exploit the Defect and access sensitive information, and that patching the Defect would result in a degradation of the CPU's advertised performance, he would not have purchased his processors, or paid substantially less for his processors.

26.     Plaintiff Jonathan Caskey-Medina is a resident and citizen of the State of Massachusetts.  On January 6, 2018, Mr. Caskey-Medina purchased a CYBERPOWERPC GUAA2600BS/AMD R5/1TB/8GB/R, containing an AMD Ryzen 5 1400 processor, for $796.86, at the Best Buy in Holyoke, Massachusetts located at 50 Holyoke Street.  The AMD processor's specifications, including its clock speed or frequency and its reliance on SenseMI Technology, were prominently displayed next to an in-store sample of the computer.  According to these specifications, the AMD Ryzen 5 1400 processor had a base clock speed of 3.2 GHz and a max turbo clock speed of 3.4 GHz and possessed "AMD SenseMI technology."  Prior to his purchase, Mr. Caskey-Medina researched different computers on the market to determine the unit that contained the best CPU for his needs.  At the time of his purchase, Mr. Caskey-Medina relied on AMD's representations that the AMD processor would perform as advertised and was not defective.  Had Mr. Caskey-Medina been aware of the Defect or that Spectre could be used to exploit the Defect and access sensitive information and that patching the Defect would result in a degradation of the CPU's advertised performance, he would not have purchased the computer, or paid substantially less for his computer.

**B.     Defendant**

27.     Defendant AMD is a Delaware corporation with its principal place of business located within this District at 2485 Augustine Drive, Santa Clara, California.  AMD was founded in Sunnyvale, California in 1969.  Defendant is engaged in the business of designing, manufacturing, selling, and/or distributing CPUs, including the defective processors at issue here.  Many of AMD's key executives are based in the District, including AMD's Chief Technology Officer, Mark

Papermaster.  All references herein to any act of AMD shall include the acts of AMD's directors, officers, employees, affiliates, subsidiaries, and agents where such persons or entities were engaged in the management, direction, or control of AMD, or where such persons or entities were acting at the direction of AMD.

### III.    JURISDICTION AND VENUE

28.    This Court has general personal jurisdiction over Defendant because it resides within this District.

29.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because this matter is a putative class action, the Class contains members, including Plaintiff, that are citizens of a state different from Defendant, there are more than 100 members of the Class, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000.

30.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts a substantial amount of business in this District.

31.    Assignment to the San Jose Division of this District is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to Plaintiff's claims occurred within the District and Defendant's principal place of business is located in Santa Clara, California.  Pursuant to Northern District of California Civil Local Rule 3-2(e), all civil actions which arise in the Santa Clara County shall be assigned to the San Jose Division.

### IV.    FACTUAL ALLEGATIONS

32.    Founded in 1969, AMD is a leading manufacturer of CPUs.  AMD both sells its processors to the marketplace as stand-alone components and sells its processors to original equipment manufacturers or OEMs that—with AMD's assistance and guidance—incorporate AMD's processors into, among other things, desktop and laptop computers, and servers.  OEMs utilizing AMD processors include household names such as Dell Inc., HP Inc., and Lenovo Group Limited.  AMD also sells its processors as stand-alone items through third party retailers.

1

### A.      CPUs, Speculative Execution, and Branch Prediction

2

33.      The CPU is the so-called "brains" of the computer, laptop, or server it powers.  CPUs

3

are responsible for processing system data and controlling other devices and components connected

4

to the system.  When the user asks the computer to perform a function or task, for example, to open

5

a document in Microsoft Word, the CPU; (i) "fetches" the necessary instruction for the task from the

6

computer's memory; (ii) "decodes" the instruction; and (iii) "executes" the instruction (collectively,

7

the "instruction cycle").  Each step in the instruction cycle takes at least one clock cycle.

8

34.      In 1981, IBM selected Intel to supply the CPU for IBM's first personal computer.  The

9

processor was known as Intel 8086.  The basic architecture or "instruction set" utilized in the Intel

10

8086, known as x86, can still be found in virtually every microprocessor designed and manufactured

11

for personal computers and laptops, and servers.

12

35.      Older CPUs were designed to complete an entire instruction cycle before advancing

13

to the next instruction.  However, executing instructions in this manner is inefficient.  Accordingly,

14

beginning in 1995, AMD introduced "pipelined" and "superscalar" processors based on its "K5" CPU

15

architecture, which simultaneously executed multiple instructions.  As reflected in Figure 1 below, a

16

"pipelined" processor with six pipeline stages can work on six independent instructions

17

simultaneously, achieving a speedup of up to 6x over an unpipelined design:

18

19

20

21

22

23

24

25

26

27

28



**Figure 1**

In a "superscalar" processor, each pipeline stage can operate on more than one instruction in parallel, further amplifying the performance improvements on top of a simple, unpipelined processor.  For example, a 4-way superscalar processor with a 6-stage pipeline can achieve up to a 24x performance improvement over a simple, unpipelined CPU.

36.     Superscalar or pipelined processors also created the possibility that the CPU's resources might be idle while executing instructions in the order dictated by a particular function or program.  As a result, engineers developed "out-of-order execution" to make use of the available pipeline resources and clock cycles that might otherwise be wasted.  By relying on out-of-order execution, a CPU can potentially eliminate any idle time associated with waiting for the completion of long latency events, such as accesses to main memory.

37.     Modern out-of-order, deeply pipelined processors often implement two critical optimization techniques: (i) branch prediction; and (ii) speculative execution.  Branch prediction attempts to guess the instructions that must be executed following a conditional branch instruction. Speculative execution is a technique whereby a CPU guesses the likely future instructions, and eagerly executes those instructions in order to keep a high-speed, deep pipeline busy with useful work.  According to a January 8, 2018 *Bloomberg* article titled, "'It Can't Be True.'  Inside the Semiconductor Industry's Meltdown," "processor makers have tried to speed up the way chips crunch data and run programs by making them guess" the instructions that the processor will need for the next task through the process of "speculative execution."  According to AMD, "[s]peculative execution is a basic principle of all modern processor designs and is critical to supporting high performance hardware."

38.     Beginning with the K5 architecture in 1995, virtually every AMD processor relied upon speculative execution and branch prediction.

**B.     The Speed Wars**

39.     The speed at which a CPU performs is a material attribute for consumers purchasing either a stand-alone AMD processor or computers, laptops, and servers powered by AMD processors. Without sufficient processing speed, a CPU will be unable to effectively and efficiently run the

device's operating system and software programs, and utilize connected hardware and peripheral devices.

40.     To measure a CPU's performance, consumers look to and rely upon the processor's specifications, including, in particular, its clock speed.  A CPU requires a number of "clock cycles" to execute each instruction.  Clock speed reflects the amount of time necessary to complete each clock cycle.  The faster the clock speed, the more instructions the CPU can execute per second.  Clock speeds are expressed in megahertz (MHz) or gigahertz (GHz).

41.     Since the 1990s, processor manufacturers have placed great emphasis on the clock rate of their processors as an indication of its performance.  Beginning with the launch of AMD's first proprietary CPU in 1995, the Company marketed each model of its processors based on its advertised clock speed.  For instance, AMD's A10-9600P processor has advertised clock speeds of 2.4 GHz (base) and 3.3 GHz (max boost).  AMD's FX 8370 has advertised clock speeds of 4.0 GHz (base) and 4.3 GHz (max boost).  AMD's A10-7850K had advertised clock speeds of 3.7 GHz (base) and 4.0 GHz (max boost).  AMD's Ryzen R5 1400 processor had advertised clock speeds of 3.2 GHz (base) and 3.4 GHz (max turbo).  AMD's website also allows prospective customers to compare the clock speed of each of its processors, and explicitly references its processors' "clocks" as setting its processors apart from the competition.  Likewise, websites reviewing and selling AMD processors allow consumers to directly compare the clock speed of available processors.

42.     AMD's focus on the clock speed of its processors led to the Megahertz Wars, followed by the Gigahertz Wars, during which Intel and AMD battled to see which manufacturer could design a CPU that had the fastest clock speed.  The "speed crown" ping-ponged back and forth between the companies, at one point changing hands several times in one quarter in 1999.  Both companies claimed to be the first to manufacture and sell a processor with a 1 GHz clock speed in early March 2000.

43.     By 2003, however, the rivals had hit a wall.  Increases in clock speed began to slow.  Where the CPU manufacturers were once able to announce materially increased clock speeds every month, now they were lucky to obtain a single digit percentage increase in a single year.  One of the primary reasons for this was memory.

44.     Memory holds all of the instructions and data the CPU utilizes to function.  Memory's frequency or clock speed often was materially slower than the CPU.  Moreover, the instructions and data stored in memory had to travel to the CPU utilizing a "bus" structure, further extending the time it took to locate and transfer instructions and data to the CPU for processing.  As a result, while the CPU was able to execute multiple instructions simultaneously, the CPU's capacity was hampered by how fast that information could be obtained from memory.  In a 1996 article for the *Microprocessor Report* called, "It's the Memory, Stupid!," a CPU architect presciently noted: "today's chips are largely able to execute code faster than we can feed them with instructions and data. . . . The real design action is in the memory subsystems – caches, buses, bandwidth, and latency."

### C.     AMD Heavily Relied Upon Speculative Execution and Branch Prediction to Achieve Advertised CPU Clock Speed

45.     No longer able to feed a CPU running at aggressive clock speeds with useful instructions, AMD was forced to contend with the speed and capacity of the memory subsystem.  AMD first addressed the issue of latency—the time it takes for instruction and data stored in memory to reach the CPU.  Released in 1999, AMD's K6-III CPU architecture moved the L2 cache to the CPU die from its prior location on the motherboard, greatly enhancing the speed of the processors.  In 2003, AMD launched the K8 CPU architecture.  K8 moved the memory controller from its separate location on the motherboard to the CPU die, which drastically reduced memory latency.

46.     A CPU dependent on branch prediction and speculative execution to productively operate at GHz clock speeds, also required sufficient cache space in which to buffer necessary instructions and data.  To that end, AMD increased the utility of the CPU's cache subsystem.  The number of caches (which store instructions and data within the CPU) increased, from one cache (L1), to two caches (L1 and L2), and finally to three caches (L1, L2, and L3).

47.     The caches grew larger.  For instance, AMD processors launched in 1995 had a 24 KB L1 cache.  One year later, AMD processors had a 64 KB L1 cache.  Processors released early in 1999 employing the K6-III architecture boasted two caches, including a 256 KB L2 cache, while processors launched in the latter half of 1999 with the K7 architecture had a 128 KB L1 cache and a 512 KB L2 cache.  With the launch of AMD's first dual "core" processors in 2003 (Athlon 64), the K8

architecture boasted two sets of L1 and L2 caches, one for each core, and the L2 cache was now 1 MB. The processor's clock speed increased accordingly—whereas processors running the K6-III architecture had advertised max clock speeds of 550 MHz, processors running the K7 (and later, the K75) architecture had advertised max clock speeds of 700 MHz to 2.3 GHz.

48.    AMD also focused on the CPU's ability to more intelligently utilize branch prediction and speculative execution to further increase efficiency and clock speed. In a preview of the new K8 architecture at the 2002 Hot Chips conference, AMD touted the fact that processors employing K8 had improved accuracy in branch prediction, and the ability to load and store more data necessary to perform "aggressive out of order" execution within the CPU's cache subsystem. This led to material increases in performance, including max clock speeds of up to 3.2 GHz for Athlon 64 X2 processors running K8. As explained in *ExtremeTech's* April 22, 2003 review of AMD's server processors based on the K8 architecture, the Opteron had "improved with 'branch selectors' in the L2 cache that reference branch locations in code, and flag the branch types, improve overall efficiency of various branch prediction structures and algorithms" which "contribute[d] to Opteron being able to process more instructions per clock (IPC) than Athlon."

49.    Following the launch of its K8 architecture, AMD identified its "Future Micro-Architectural Innovations," at the October 2003 Microprocessors Forum, listing among other things: (i) "Much higher performance superscalar, out of order CPU core[s];" (ii) "Huge caches;" and (iii) "Branch and memory hints" and enhanced branch predictors. In 2006, AMD previewed its "next generation processor technology" at the annual Hot Chips conference, touting its "Balanced, Highly Efficient Cache Structure," including a new L3 cache, and "Improved branch prediction."

50.    Thereafter, in 2007, AMD launched its Phenom processors, which utilized the K10 CPU architecture. The K10 architecture contained a number of improvements to further enhance AMD's ability to improve system performance. For instance, the K10 architecture boasted major improvements in the architecture's memory subsystem, to complement AMD's ability to harness performance efficiencies gained through the use of speculative execution and branch prediction. K10 had a larger indirect branch predictor and return address stack, and had an L3 cache of up to 6 MB

shared among the cores.  Processors employing the K10 architecture achieved max clock speeds of 2.6 GHz to 3.7 GHz.

51.    In 2010, AMD announced the launch of two new CPU architecture families—Bulldozer, for mainstream processors, and Bobcat, for low-powered processors.  Bulldozer and Bobcat represented a complete redesign of AMD's approach to CPU architecture.  In particular, Bulldozer featured "Prediction-Directed Instruction Pre-Fetch," as well as larger pipelines and caches, increasing the processor's ability to fetch and store instructions and data for speculative execution and branch prediction.  Processors running the Bulldozer architecture achieved max clock speeds of 4.2 GHz to 4.3 GHz.

52.    Then, in early 2014, AMD began producing processors utilizing the Steamroller CPU architecture, the third-generation successor to Bulldozer.  Steamroller maintained Bulldozer's basic design but included better instruction schedulers, improved branch prediction, and larger and smarter caches.  For instance, according to an *AnandTech* August 28, 2012 review of Steamroller, while Piledriver—AMD's second generation Bulldozer architecture—boasted a "major design improvement[] . . . in branch prediction," Steamroller "inherit[ed] the perceptron branch predictor from Piledriver, but in an improved form for better performance (mostly in server workloads)."

53.    In 2015, AMD launched the fourth and final generation of Bulldozer.  Known as Excavator, the architecture included a faster L1 cache that was capable of processing 15% more instructions per clock compared to Steamroller.  The Excavator architecture also included a larger branch target buffer (50% larger as compared to Steamroller-based CPUs), which helped improve performance.

54.    Thereafter, in 2017, AMD launched "Zen," its most recent and ambitious CPU architecture.  With Zen, AMD attempted to design an intelligent CPU, which would rely extensively on high-level speculative execution and branch prediction to achieve more than 50% performance gains over the Excavator architecture.  Commenting on Zen at the May 2017 Analyst/Investor Day, AMD's CTO Mark Papermaster, stated:

> We delivered over 52% of performance gain generationally, and it was really hard-nosed focused engineering effort. It starts with the execution engines. You look at what we did, we widened our execution pipes by 50%. We increased the instruction

scheduling by 75%, so you can flow that instruction execution much more effectively each clock tick.

But that only works if you can feed that engine. So what did we do? ***We have to be able to feed the beast, so we improved on the instruction side with a very smart branch prediction. We actually built in a Perceptron to have much more accuracy, a Perceptron engine to give us better accuracy in our branch prediction.*** We inserted a Micro-Op Cache to more efficiently dispatch those instructions to those pipelines, and then you have to feed it from the data side.

***We revamped our cache subsystem.*** We increased our cache size. We added a dedicated L3 cache, and we advanced our pre-fetch algorithms, our memory pre-fetch algorithms. Looking at the strides of data, what's the patterns coming in and getting the right data where you need it at the right time.

On top of all of that, we added simultaneous multi-threading. So your execution engines are precious. And so if you do have an install, you're waiting for some data to complete instruction, you want to flip over on a new thread. So simultaneous multi-threading effectively doubles the number of threads. It looks to the operating system like a doubling of the cores available to get any work done.

And what's the result? It's a dramatic improvement of instruction-level parallelism of that execution. Said another way, ***it's a dramatic increase in the performance at every clock tick.*** And so that's what we've done. The team has delivered competitive x86 single-threaded high-performance and hands-down leadership of multi-threaded performance and application development -- and application performance. This achievement absolutely defies industry convention to have this type of gain in a single generational update of CPU design.

55.     AMD has manufactured and sold two new lines of processors based on the Zen architecture: the Ryzen family of processors for desktop and laptop computers and EPYC family of processors for servers.  All Ryzen processors have SenseMI Technology, which is listed as a "Key Feature" in the specifications for each processor.  SenseMI Technology includes "Neural Net Prediction" (predicting the pathway—or branch—that the program will take) which is related to speculative execution functions.  According to AMD, "SenseMI technology is a key enabler of AMD's landmark increase of greater than 40 percent in instructions per clock."

56.     Over at least the last 15 years, AMD has continually touted the advances in its design of components intended to support speculative execution and branch prediction, and tying these attributions to increased advertised clock speeds and overall processor performance.  AMD's efforts to market each new CPU architecture or processor line as faster and more efficient due to, among other things, speculative execution and branch prediction, led to revenues in the tens of billions of dollars.  However, consumers purchased these intelligent, high-speed processors without knowing the truth: the use of speculative execution and branch prediction in each and every one of these CPUs

1    created a security vulnerability which, when exploited, could leak a user's most sensitive data, and

2    the only way to patch these vulnerabilities would be degrade the advertised and promised

3    performance of the CPUs themselves.

4         **D.    AMD's Processors Are Defective**

5         57.    Together with the introduction of superscalar processors, out-of-order execution has

6    delivered dramatic performance improvements over older processors.  Indeed, CPUs are only able to

7    meet their advertised performance metrics by relying on advanced out-of-order execution effectuated

8    through sophisticated instruction and data pre-fetching, dataflow analysis, branch prediction, and

9    speculative execution, as well as numerous pipelines and caches.

10        58.    However, unbeknownst to Plaintiff and the Class, processors manufactured and sold

11   by AMD that relied on, among other things, branch prediction and speculative execution to achieve

12   performance speeds were defective.  Specifically, AMD's processors use of speculative execution

13   and branch prediction to achieve advertised clock speeds exposes users to the possibility of side-

14   channel attacks, including a set of exploits known as "Spectre."  As quoted in a January 8, 2018

15   *Bloomberg* article, Paul Kocher, one of the researchers who helped uncover Spectre and has been

16   studying the trade-offs between security and performance, succinctly stated: "[t]he processor people

17   were looking at performance and not looking at security."

18        59.    Spectre gets its name from "speculative execution," and the fact that this class of

19   security vulnerabilities are not easy to fix and will "haunt" the industry for a long time.  Spectre can

20   be used to steal sensitive data, such as user names and passwords or credit card information, from a

21   computer's "kernel."  The kernel is the most secure part of any computer, and it is fundamental to the

22   operation of the system.  One of its most basic functions is preventing data associated with one

23   program from being accessed or overwritten by another program.  To that end, the kernel acts as a

24   go-between for all of a computer's applications, operations, and peripheral devices (*e.g.*, the

25   keyboard, mouse, or printers).  For instance, when a program needs access to credit card data stored

26   in a computer's memory, the kernel acts as an intermediary to prevent the program from gaining

27   direct access to that information.

28        60.    In processors that deploy speculative execution, the CPU can guess the next

instruction that must be executed following a branch instruction, and aggressively fetch and execute instructions from this predicted path rather than wait for the branch to complete its execution.  In the case of a branch misprediction, the direct side-effects of the speculatively executed instructions are ultimately undone (*i.e.*, "flushed"), but the remnants of sensitive kernel data, including measurable data that may reveal its location or other salient details, remain in the caches, each of which is vulnerable to side-channel attacks employed by hackers.

61.     As explained in a January 3, 2018 *Google Security Blog* regarding Spectre, with the security vulnerabilities inherent in speculative execution, "malicious actors c[an] take advantage of speculative execution to read system memory that should have been inaccessible" and may, as a result, be able to "read sensitive information in the system's memory such as passwords, encryption keys, or sensitive information open in applications."  As explained in the seminal white paper describing the Spectre exploits, "Spectre attacks involve inducing a victim to speculatively perform operations that would not occur during correct program execution and which leak the victim's confidential information via a side channel to the adversary."

62.     To date, researchers have identified four types of Spectre attacks, and are likely to discover more.  Each variant takes advantage of the CPU's efforts to look ahead and speculatively execute future instructions while it waits to complete more time-consuming tasks, and includes a side-channel attack the purpose of which is to obtain information about sensitive kernel data left behind in the cache after the CPU unwinds incorrectly executed instructions.

63.     As explained by AMD itself in late January 2018, Spectre Variant 1 or "Bounds Check Bypass," exploits the CPU's effort to resolve "memory references that are beyond the enforced privilege limit of access for the program," known as "bounds checking."  Bounds checking may require "a large number of processor cycles for the processor to obtain" the necessary information to assess the relevant boundary for the privileged information.  At that point, the CPU "may speculate and bring in cache lines that are currently allowed to be referenced based on the privilege of the current mode but outside the boundary check." Once the bounds check is resolved, anything that should not have been speculatively executed is reversed.  However, this reversal does not remove

1    information about the kernel data from the CPU's caches, allowing a hacker to use a cache timing

2    side-channel attack to access this data.

3         64.    Spectre Variant 2 or "Branch Target Injection" exploits the time it takes for a CPU

4    to resolve a mispredicted branch path and identify the correct target.  A hacker can trick the CPU to

5    mispredict the branch path, leading the processor to speculatively execute instructions down that path

6    that require access to sensitive kernel data.  Once the CPU identifies the correct target, it unwinds the

7    improperly executed instructions, but the information about the accessed kernel data remains in the

8    CPU's caches.  As with Spectre Variant 1, the hacker would then rely on a cache timing side-channel

9    attack to access this data.

10        65.    Spectre Variant 3a or "Rogue System Register Read" involves speculative reads of

11   system register values used in speculative load instructions.  Such subsequent speculative loads cause

12   allocations into the cache that may allow a sequence of speculative loads to be used to perform timing

13   side-channel attacks.  This allows an attacker with local user access to use timing side-channel

14   analysis to determine the values stored in system registers.

15        66.    Spectre Variant 4 or "Speculative Store Bypass" exploits the time it takes for a CPU

16   to store data to memory.  In that instance, the CPU will look to execute other instructions that are not

17   dependent on the completion of the particular data store effort.  Once the data store is complete, the

18   CPU will reverse any incorrectly executed instructions, leaving information about the kernel data in

19   the CPU's caches, which hackers can access through a side-channel attack.  The problem is so

20   widespread that a May 23, 2018 *BusinessReport* article quoted Intel CEO Brian Krzanich as stating

21   that "[p]hones, PCs, everything are going to have some impact" from the latest Spectre variant.

22        67.    Each of the four currently known Spectre variants impacts virtually all AMD

23   processors that utilize the x86 instruction set and rely on speculative execution and branch prediction.

24   As a result, ***all*** of the processors manufactured and sold by AMD since 1995 are defective in that they

25   contain design flaws that expose the CPUs to a variety of security vulnerabilities that are exploited

26   by the Spectre variants.

27

28

---

**E.      AMD's Knowledge of the CPU's Vulnerability to Side-Channel Attacks**

68.      Although unknown to the consumer public, the concept of potential security weaknesses of CPUs using speculative execution is not novel among academics and industry experts, including AMD executives.  For more than a decade, researchers have been warning companies like AMD of Spectre-like security attacks that exploit a CPU's out-of-order execution process to execute side-channel attacks.  For instance, as noted in a January 10, 2018 *Bloomberg* article titled, "'It can't be true.' Inside the semiconductor industry's meltdown," in early 2005, "[r]esearchers began writing about the potential for security weaknesses at the heart of central processing units."  Yuval Yarom, a researcher from the University of Adelaide who helped discover Spectre, is credited with some of these earlier findings.

69.      By 2013, industry researchers identified additional security flaws in CPUs that let unauthorized users see the layout of the kernel.  This vulnerability, known as a KASLR break, served as the foundation for the discovery of Spectre.

70.      Thereafter, in August 2014, AMD participated in a security-focused tutorial at the Hot Chips 26 industry conference.  During his presentation, AMD Corporate Fellow Van Doorn identified the components central to a "secure systems design" as: (i) "[w]ell-defined security properties (objectives);" (ii) a "[t]hreat analysis (what are we protect[ing,] from whom, cost of entry);" and (iii) a "[d]esign metholog[y] (test plan, penetration testing, code review, etc.)."   In answering the question, what happens if you do not have a "secure system design"?, Van Doorn confirmed that "Hardware is not safe" and used as an example "side channel attacks":



Commenting on this slide, Van Doorn concluded that "side channel attacks" on hardware as "*a very rich area of attack and very hard to protect against*."

71.     After Van Doorn presented, Dr. Lee of Princeton University spoke about "University Research in Hardware Security," including how to detect and mitigate side channel attacks.  Dr. Lee noted that there were many types of "side channels" including "caches" and "branch prediction." With respect to "Secure Hardware Design," Dr. Lee identified "[s]ecure caches that do not leak information," noting that a fix for a recent software attack which leaked sensitive data (Heartbleed) did nothing to secure the same information from a side-channel attack on hardware.  She described the problem as "[c]orrectly functioning hardware caches leak secret information through cache side-channel attacks."  According to Dr. Lee, "*[a]ll current processors with caches are vulnerable*" to side channel attacks "from embedded devices to cloud servers."

72.     Significantly, this was not the first time that Dr. Lee presented on side channel attacks. In 2006, she co-authored a paper entitled, "Covert and Side Channels due to Processor Architecture." The abstract for this paper is prescient given the later discovery of Spectre: "Information leakage through covert channels and side channels is becoming a serious problem, especially when these are enhanced by modern processor architecture features.  We show how processor architecture features such as simultaneous multithreading, control speculation and shared caches can inadvertently accelerate such covert channels or enable new covert channels and side channels."

73.     In 2016, research conducted by Felix Wilhelm and others showed how an early version of speculative execution could make chips vulnerable to security exploits and data leaks.  In August 2016, at Black Hat USA, a major cybersecurity conference in Las Vegas, a group of cyber-security researchers led by Anders Fogh and Daniel Gruss presented a research paper titled "Using Undocumented CPU Behavior to See into Kernel Mode and Break KASLR in the Process."  The paper divulged potential cyber-attacks on the CPU hardware itself, specifically focusing on the x86 architecture, and concluding that it was possible for an attacker to access the secure kernel data via the use of low security programs such as JavaScript.  The researchers were skeptical, however, that this was a real flaw, assuming that chipmakers would have uncovered such a "glaring security hole during testing and would never have shipped chips with a vulnerability like that."

74.     Anders Fogh and his team again discussed the potential method of attack at the Black Hat Europe conference in November 2016, but there was still a level of skepticism among researches that such a dangerous security vulnerability would have been missed by chip manufacturers.  Effectively, the industry assumed that companies like AMD had heeded the warnings of academic researchers, and/or had conducted the type of security analysis described by AMD Corporate Fellow Van Doorn in 2014.  In other words, for all intents and purposes, the public justifiably believed that AMD had well-defined objectives with respect to its CPUs, had conducted threat analyses, and implemented plans to test the CPU and its components (*e.g.*, the cache subsystem), including penetration testing and code review.

75.     By January 2017, Anders Fogh discovered how the security vulnerabilities created by the use of speculative execution could be exploited to attack the kernel.  He disclosed his findings at an industry conference on January 12, and by March he had shared his idea with other industry experts.

76.     In April 2017, Jann Horn, a member of Google's Project Zero, a team of security researchers tasked with finding "zero-day" security holes, had independently discovered the first two Spectre exploits.  Mr. Horn disclosed these findings to AMD and ARM Holdings by June 1, 2017, and soon after Intel informed Microsoft about same.  The tech giants began secretly working on purported fixes.

77.     By the middle of 2017, the researchers had developed a software security patch they called "KAISER" that was designed to fix the KASLR break.  The patch was specifically designed for Linux, the world's most popular open-source operating system, which controls servers and also underlies the Android operating system used by the majority of mobile devices.  The Linux updates were required to be shared publicly, and KAISER was well-received by the developer community.

78.     Unbeknownst to the public, however, AMD, Intel, ARM Holdings, Google, and Microsoft were already scrambling to find a fix for a much bigger attack that they were aware of.  In late November 2017, large tech companies such as Microsoft, Amazon, Google, ARM, and Oracle Corp. began rolling out Linux updates, which prompted cybersecurity researchers who were unaware of the existence of Spectre to question their motivation for developing and issuing such patches.  Tests conducted with respect to these patches demonstrated serious implications for the performance of key computer systems, with one Amazon patch decreasing performance speed by up to 400%.  Despite the massive performance hit, Amazon was still encouraging Linux users to accept the software patch, solidifying suspicions that there must be a larger, but as of yet undisclosed, security issue looming.

79.     By December 3, 2017, researchers unaffiliated with the groups who had discovered Spectre in June 2017 confirmed the existence of another related exploit, Meltdown, and were shocked to uncover that sort of "mistake" in processors that allowed for the security exploit.  The researchers reported these findings to Intel the following day, and were surprised to learn that Intel and other chipmakers had already been made aware of the security exploits for months by Jann Horn and others.

80.     Consumers remained unaware of the Defect due in part to AMD's reassurances that its processors were secure.  As an initial matter, the hallmark of a cache timing side channel attack— the method used by all four Spectre variants to obtain access to information about sensitive data—is that it is invisible to the operating system and leaves absolutely no trace.  As a result, Spectre cannot be detected by anti-virus software or other mechanisms meant to protect the computer, laptop, or server from malware.  Therefore, a consumer utilizing a defective processor would not have any indication that her CPU's cache subsystem is leaking information about the most sensitive data stored within the device.

81.     Moreover, ordinary consumers would not have been aware of, have access to, or even have sufficient expertise to understand the ramification of much of the industry research.  Instead, consumers relied on AMD's representations concerning its CPUs.  For instance, certain processors manufactured from 2013 until the present include AMD's platform security process or PSP, known commercially as "AMD Secure Technology."  According to AMD's developer's guide for its processors, the PSP is "responsible for creating, monitoring and maintaining the security environment" and "its functions include managing the boot process, initializing various security related mechanisms, and monitoring the system for any suspicious activity or events and implementing an appropriate response."

82.     On its website, AMD describes AMD Secure Technology as follows:

**Ultimate protection for AMD products**
The growth of mobile devices and cloud services is rapidly changing the computer industry, and threats to your privacy and security are growing ever more diverse and sophisticated. Anti-virus protection alone is no longer sufficient to keep your system secure. You need a robust hardware solution. AMD Secure Technology brings you a built-in security system that puts the protection right on your processor. Through our collaboration with an extensive network of platform providers, we are working to provide the greatest peace of mind on every AMD product.

**Security built right into your hardware**
AMD gives you a dedicated AMD Secure Processor[1] built into select AMD Accelerated Processing Units (APUs). ARM® TrustZone®, a system-wide approach to security, runs on top of the hardware creating a secure environment by partitioning the CPU into two virtual "worlds." Sensitive tasks are run on the AMD Secure Processor – in the "secure world" – while other tasks are run in "standard operation." This helps ensure the secure storage and processing of sensitive data and trusted applications. It also helps protect the integrity and confidentiality of key resources, such as the user interface and service provider assets.

83.     Processors that include AMD's PSP list "AMD Secure Technology" in the "Supported Technologies" section of the CPU's specifications.  Incredibly, even AMD's PSP has been the subject of security vulnerabilities, including a handful of serious flaws impacting Ryzen and EPYC processors, all of which are known as Ryzenfall, Masterkey, Chimera, and Fallout, first announced in March 2018.

1

### F.      AMD's Knowledge of Spectre Variants 1 and 2

2      84.      Although the public only became aware of Spectre in January 2018, AMD has been

3   aware of Spectre since *at the latest* June 1, 2017, when a team from Google's Project Zero alerted

4   the company to the existence of the Defect.

5      85.      Google's Project Zero team was not the only researcher to have uncovered Spectre, as

6   when Intel responded to the news of the discovery from Graz researchers—nearly a week after having

7   been informed of the exploits—Intel told the researchers that it had already been informed about the

8   vulnerability by two other research teams.  Including another, related technique that would come to

9   be known as Spectre, Intel told the researchers they were actually the *fourth* to report the new class

10   of attack, all within the period of just a few months.

11      86.      Further, as discussed *supra*, AMD knew, or should have known, of the Defect in its

12   processors many years ago given that AMD was in a superior position to perform proper tests and

13   security checks of its processors and appropriate due diligence would have revealed the

14   vulnerabilities that were uncovered by various independent teams.  Indeed, Defendant had actual

15   knowledge, and access to proprietary information to discover, that defects in design were causing the

16   Defect in its processors.  As stated by Paul Kocher, one of the researchers who identified Spectre,

17   "[t]here's no reason someone couldn't have found this years ago instead of today."

18      87.      These early reports ultimately prompted industry presentations at various "Black Hat"

19   and other cybersecurity conferences in 2016 and 2017, including presentations by members of the

20   Graz University team, regarding potential attacks against the kernel memory of CPU processors, such

21   as the Spectre Variants.

22      88.      Nevertheless, rather than inform the public about Spectre, AMD continued to sell its

23   defective processors to unknowing customers at prices much higher than what customers would have

24   paid had they know about the Defect and the impact on processing speeds.  In fact, with its EPYC

25   processor, AMD sought to reenter the server market with a fast, efficient, and *secure* CPU based on

26   the Zen architecture.  Commenting on EPYC at the May 2017 Analyst/Investor Day, the SVP and

27   GM of AMD's Enterprise, Embedded, and Semi-Custom Business Group, Forrest Norrod stated:

28

And so the way that we're attacking that market is, you guessed it, EPYC. We're attacking that market with a part that Mark and the whole team at AMD has generated, has wrought from those 32 "Zen" cores, offering tremendous power and flexibility. But it's a balanced design. So each "Zen" chip with those 32 cores is coupled to 8 memory channels to keep that beast fed, to keep performance available to applications. We're also adding 128 lanes of high-bandwidth I/O on each EPYC chip, again, so that we can pull in data from the network, from the drives, from flash.

And **none of this would matter if we didn't also support security**, something that has become all too evident in today's world and we were reminded of earlier this week and over the weekend. ***Security is paramount. Doesn't matter how fast your chip is. If it can't help be part of the security solution, it's part of the problem.*** And so that's what we brought.

89.     In August 2017, after AMD had learned about Spectre, AMD presented on its EPYC processors at Hot Chips 29.  With respect to security, AMD once again touted EPYC's ability to "***defen[d] against unauthorized access to memory***."

### G.     Spectre "Patches" Are Inadequate and Materially Impact CPU Performance Once Installed

90.     Because the Defect is fully integrated into the design of the CPU, there is no way to completely eliminate the security vulnerabilities created by the use of speculative execution and branch prediction to achieve high processor clock speeds.  As explained by a January 9, 2018 *Scientific American* article, soon after Spectre's public disclosure, the security vulnerabilities "can only be mitigated—not fixed—at this time" because of the flaw's vast impact to "operating systems, drivers, Web servers and databases."  Only a fundamental change in the design of the CPU itself can ensure that such security vulnerabilities can be adequately accounted for and removed.  Significantly, companies such as AMD and Intel simply cannot abandon the use of speculative execution and branch prediction in their CPU architectures.  Doing so would be akin to abandoning the car in favor of the horse-drawn carriage.

91.     Attempts to mitigate the Defect have been particularly complicated.  As explained by *Ars Technica* in a January 3, 2018 article entitled, "'Meltdown' and 'Spectre': Every Modern Processor Has Unfixable Security Flaws":

while there may be limited ways to block certain kinds of speculative execution, general techniques that will defend against any information leakage due to speculative execution aren't known.

---

> Sensitive pieces of code could be amended to include 'serializing instructions'—instructions that force the processor to wait for all outstanding memory reads and writes to finish (and hence prevent any speculation based on those reads and writes)—that prevent most kinds of speculation from occurring. . . . But these instructions would have to be very carefully placed, with no easy way of identifying the correct placement.

As such, *Ars Technica* confirmed in a January 11, 2018 article entitled, "Here's how, and why, the Spectre and Meltdown patches will hurt performance," "at-risk applications (notably, browsers) are being updated to include certain Spectre mitigating techniques to guard against the array bounds variant" while "[o]perating system and processor updates are needed to address the branch prediction version." Some sources, including *Wired* in a January 6, 2018 article, predict that Spectre "may be impossible to defend against [ ] entirely in the long term without updating hardware."

92.     Any attempts to address the Defect come at a cost to a CPU's processing speed. As *The Register* explained in a January 2, 2018 article entitled "Kernel-memory-leaking Intel Processor design flaw forces Linux, Windows redesign," discussing the impact of the software "patches:"

> It allows normal user programs – from database applications to JavaScript in web browsers – to discern to some extent the layout or contents of protected kernel memory areas.
>
> The fix is to separate the kernel's memory completely from user processes using what's called Kernel Page Table Isolation, or KPTI. . . .
>
> The downside to this separation is that it is relatively expensive, time wise, to keep switching between two separate address spaces for every system call and for every interrupt from the hardware. These context switches do not happen instantly, and they force the processor to dump cached data and reload information from memory. **_This increases the kernel's overheard and slows down the computer_**.

93.     *The Register* went on to note that while "[t]he effects are still being benchmarked, [ ] we're looking at a ballpark figure of five to 30 per cent slow down, depending on the task and the processor model." Regardless of the amount of slowdown, AMD's processors will not perform as promised and advertised once patched.

94.     Research confirms that current software "patches" or updates that have been issued to combat Spectre have resulted, in "corresponding performance slowdowns" given that "the fixes involve routing data for processing in less efficient ways," as explained in a January 6, 2018 *Wired*

article.  Furthermore, Microsoft Corp. has recently acknowledged that Spectre-related patches for computers running Windows operating systems with affected processors result in "a performance impact."  As such, it is improper to term these security "patches" as a "fix."  Rather, as Jérôme Boursier, a researcher at Malwarebytes, explained to *Fox News* in January 2018, the patches are simply "a set of workarounds … they aren't a fix.  They just change the system behavior to avoid using the bad-designed part of the CPU."  The Spectre Variants take advantage of design flaws in AMD processors created to increase processing speeds, and thus any "patch" that attempts to workaround such design flaws would not be a true "fix," but rather would result in a decrease in performance since the patch avoids utilizing such processes that would otherwise increase processing speed.  According to Mr. Boursier, "[t]hat's because the fix in effect, plugs the vulnerable processes that would otherwise boost performance."

95.    In fact, according to *Wired*, on January 12, 2018, "Microsoft paused distribution of its Meltdown and Spectre patches for certain AMD processors after the update bricked [or rendered inoperable] some machines" and "Microsoft claims that its patches were flawed because of inaccuracies in AMD's chip documentation."

96.    Although AMD initially downplayed its exposure to Spectre, by January 11, 2018, AMD was forced to admit that almost every AMD processor in use was vulnerable to Variants 1 and 2 of Spectre.  At that point, AMD could only say that "[w]e believe this threat can be contained with an operating system (OS) patch."  But the software and firmware updates proved to be far from a "fix."

97.    The hurried "patches" created more problems than they solved, spurring a series of unintended consequences such as putting computers into a continuous reboot cycle, which led some manufacturers to recommend that customers stop downloading the patches altogether until the issues could be rectified, leaving consumers in a classic "Catch-22" situation.  Even more concerning, some of the patches, including Windows patches, are incompatible with certain, often costly, anti-virus software, preventing some users from receiving the emergency patches at all, or having to disable critical anti-virus software.  The patches have also shown to be incompatible with "older" processors,

leading AMD to refrain from releasing any patches for its pre-2011 processors that suffer from the Defect.

98.     Patches released for the most recent Spectre variants are likely to put a significant drain on CPU performance, with Intel predicting performance impacts of approximately two to eight percent.  In other words, consumers can only achieve added security protection at the expense of their CPUs' performance, if they can obtain security protection at all based on the age of the processor. With regard to the most recent Spectre variants, AMD is warning users to keep systems updated and said Microsoft was wrapping up testing for an AMD-specific fix, though nothing has been released to date.

99.     In reality, the only true "fix" for the security vulnerabilities inherent in AMD's defectively designed CPUs is a newly designed chip.  Indeed, Intel's CEO Brian Krzanich's January 25, 2018 announcement that Intel expects to ship a newly designed chip without these flaws by the end of 2018 is telling in this regard.   Mr. Krzanich's announcement demonstrates that CPU manufacturers have little faith that such security vulnerabilities can be cured by the patches, which, as explained herein, do little more than attempt to bypass the security flaws and mitigate the risks.

100.     Many experts predict that Spectre is just the tip of the iceberg of a new wave of attacks leveraging the security flaws inherent in speculative execution processes.  Anders Fogh, one of the researchers who helped uncover the Spectre vulnerabilities, predicted that speculative execution would likely be a "Pandora's box" for future security vulnerabilities.  As such, Spectre is likely only just the beginning of similar cache timing side-channel attacks leveraging the speculative execution flaw inherent in AMD's CPUs.  As stated bluntly by Paul Kocher, a researcher who helped uncover the Variants, "Spectre is going to live with us for decades."

101.     In a May 22, 2018 *SC Media* article, Tod Beardsley, research director at Rapid7 (a well-known computer security management and compliance company), echoed these sentiments: "Given the complexity and ubiquity of side-channel attacks enabled by speculative execution, I doubt these will be the last variants that will be announced."  In the same article, Oren Aspir, CTO at Cyberbit, likewise warned that the public cannot rely on the patches to cure the security defects, "[b]ecause even after patching Variant 4, we can expect Variants 5, 6 and 7 to appear sooner or later."

**H.     Defendant's Attempts to Limit and Disclaim Warranties are Unconscionable**

102.    Based on pre-production testing, pre-production design or failure mode analysis, post-production testing and research, much like that done by Google's Project Zero and the Graz University of Technology, and information from third-party researchers given to it in June 2017, Defendant was aware of the defect in its processors but did not correct the defect prior to sale in order to achieve higher processing speeds in their products, which they then falsely marketed as defect-free.  This information was not available to Plaintiffs and members of the Classes at the time of their purchases.

103.    The average lifespan of a computer is five to six years, but the average lifespan of a computer processor can be longer before there is a failure.  As a result, Defendant knew that the defect in the processors would be discovered while most of the processors sold were still in use.

104.    Defendant took into account the defect in selecting the durational term of the warranties of two or three years, which was well below the average and expected lifespan of the processors or the computer in which they were installed.  Defendant also disclaimed design defects and the implied warranties, because they knew they had designed their processors with the Defect in order to achieve higher processing speeds.  These non-negotiable terms were selected unilaterally by Defendant in order to avoid having to honor the warranty for the vast majority of their processors when the defect was inevitably discovered, leaving Plaintiffs and members of the Classes without any warranty protection for the Defect and the damages caused by the Defect.

105.    Plaintiffs and members of the Classes lacked the ability to negotiate or even review the terms of the warranty prior to purchase.  The warranties are offered on a "take-it-or-leave-it" basis, the terms of which are not available until the product is purchased and the packaging opened.  In fact, Defendant published warranty terms on its website, but the terms of the warranty that Plaintiffs received with their products differed from those published.  As a result of the difference between the warranty language published by Defendants and the warranty contained in the boxes of the processors or computer purchased by Plaintiffs and members of the Classes, the applicable terms of the warranties were a surprise to Plaintiffs.

106.    Plaintiffs and members of the Classes are also without meaningful choice in the selection of processors.  Together, AMD and Intel control nearly 100% of the computer processor market.  Intel processors are usually more expensive than their AMD counterparts, leaving Plaintiffs and consumers with only one choice for a more affordable processor for their computers: AMD.

107.    AMD also disclaims implied warranties, such that AMD provided products to Plaintiffs and the Classes while forcing them to agree that the product would be completely useless, or unfit for its ordinary purpose.

108.    There is no reasonable commercial justification for such broad disclaimers and limitations on liability.  Defendant had obligations under the Uniform Commercial Code, as well as state and federal law, to not falsely advertise or misrepresent the quality or security of their products, so it cannot be commercially reasonable to attempt to evade those legal obligations by way of disclaimers buried in warranties which are not available for review prior to purchase.  Defendant was not selling used products at a yard sale—where an "as is" limitation might be commercially appropriate—it is a technology giant providing a significant portion of the marketplace with the "brains" of their computers.

109.    Further, the disclaimers are unenforceable under CAL. CIV. CODE § 1668, which prohibits enforcement of contract terms where the contract attempts to "exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent…"

110.    Here, to the extent Defendant is seeking to invoke the disclaimers or limitations on liability to avoid responsibility for their violation of several laws, including the CLRA, the UCL, Florida Unfair & Deceptive Trade Practices Act (" FDUPTA"), Massachusetts General Law Chapter 93A, and Louisiana Civil Code articles 2520 and 2524, among others, they are "against the policy of the law" and cannot be enforced.

V.    **TOLLING OF THE STATUE OF LIMITATIONS AND ESTOPPEL**

111.    **Discovery Rule Tolling**.   Plaintiffs and members of the Class could not have reasonably discovered through the exercise of reasonable diligence that their AMD processors

suffered from major security vulnerabilities that, if mitigated, resulted in reduced processing performance, within the time period of any applicable statute of limitations.

112.   Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a latent defect and/or that the AMD processors contained a defect that exposed them to security vulnerabilities that, if mitigated, resulted in reduced processing performance.

113.   **Fraudulent Concealment Tolling**.   Throughout the time period relevant to this action, Defendant concealed from and failed to disclose to Plaintiffs and members of the Class vital information concerning the Defect described herein, despite the fact that Defendant knew, or should have known of, the Defect in its Processors well before its discovery by a third party.

114.   Defendant kept Plaintiffs and members of the Class ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiffs nor members of the Class could have discovered the Defect, even upon reasonable exercise of diligence.

115.   Despite its knowledge of the Defect, Defendant failed to disclose and concealed, and continues to conceal, critical information relating to the Defect from Plaintiffs and members of the Class, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

116.   Plaintiffs and members of the Class justifiably relied on Defendant to disclose the Defect in the AMD processors they purchased or leased (either directly or as a component of, among other things, a computer or server), because the Defect was hidden and not discoverable through reasonable efforts by Plaintiffs and members of the Class.

117.   Thus, the running of all applicable statutes of limitations have been suspended with respect to any claims that Plaintiffs and members of the Class have sustained as a result of the defective AMD processors by virtue of the fraudulent concealment doctrine.

118.   **Estoppel**. Defendant was under a continuous duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the defective processors and associated security vulnerabilities and reductions in processing performance, but concealed the true nature, quality, and character of the processors.

119.    Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## VI.    CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring this proposed action pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3) on behalf of the following Classes:

**Nationwide Class:** All persons or entities that purchased or leased one or more AMD processors, or one or more devices containing an AMD processor in the United States within the applicable statute of limitations;

**California Class:** All persons or entities that purchased or leased one or more AMD processors, or one or more devices containing an AMD processor in the state of California within the applicable statute of limitations;

**Florida Class:** All persons or entities that purchased or leased one or more AMD processors, or one or more devices containing an AMD processor in the state of Florida within the applicable statute of limitations;

**Louisiana Class:**  All persons or entities that purchased or leased one or more AMD processors, or one or more devices containing an AMD processor in the state of Louisiana within the applicable statute of limitations; and

**Massachusetts Class:**  All persons or entities that purchased or leased one or more AMD processors, or one or more devices containing an AMD processor in the Commonwealth of Massachusetts within the applicable statute of limitations.

121.    Excluded from the Classes are Defendant and any parents, subsidiaries, corporate affiliates, officers, directors, employees, assigns, successors, the Court, Court staff, Defendant's counsel, and all respective immediate family members of the excluded entities described above. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to establish subclasses where appropriate.

122.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under FED. R. CIV. P. 23.

123.     **Numerosity**. FED. R. CIV. P. 23(a)(1):  The Classes are so numerous that individual joinder of all potential members is impracticable.  Plaintiffs believe that there are at least thousands of proposed members of the Classes throughout the United States.  Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

124.     **Commonality and Predominance**. FED. R. CIV. P. 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

A.     Whether Defendant engaged in the conduct alleged herein;

B.     Whether Defendant's processors are defective;

C.     Whether the purported "patches," "fixes," or other remedies are ineffective and/or result in reduced processing performance;

D.     Whether any such reduced processing performance is material;

E.     Whether Defendant knew, or should have known, that its processors were defective and that, if mitigated, resulted in reduced processing performance;

F.     Whether Defendant had a duty to disclose, and breached its duty to disclose, that its processors were defective and that, if mitigated, resulted in reduced processing performance;

G.     Whether Defendant intentionally, recklessly, or negligently misrepresented or omitted material facts including the fact that its processors are defective and that, if mitigated, resulted in reduced processing performance;

H.     Whether Defendant breached its express warranties in that its processors were defective with respect to manufacture, workmanship, and/or design;

I.     Whether Defendant breached its implied warranties in that its processors were defective with respect to manufacture, workmanship, and/or design;

J.     Whether Defendant violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*;

K.     Whether Defendant violated California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*;

L.      Whether Defendant violated California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.*;

M.      Whether Defendant violated the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. § 501.201, *et seq.*;

N.      Whether Defendant breached its warranty in violation of LA. CIV. CODE ANN. Art 2520, 2524;

O.      Whether Defendant committed deceptive acts or practices in violation of MASS. GEN. LAWS ch. 93A, §2;

P.      Whether Plaintiffs and members of the Classes overpaid for AMD processors;

Q.      Whether Defendant made material omissions concerning the true characteristics of the AMD processors, including the existence of significant security vulnerabilities in the processors as designed;

R.      Whether members of the Classes would not have purchased or leased—or would have paid significantly less for—AMD processors (or devices containing AMD processors), had Defendant disclosed the Defect;

S.      Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

T.      Whether Plaintiffs and members of the Classes are entitled to damages and other monetary relief and, if so, in what amount.

125.    **Typicality**. FED. R. CIV. P. 23(a)(3): Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through Defendant's wrongful conduct as described above.

126.    **Adequacy**. FED. R. CIV. P. 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

127.    **Declaratory and Injunctive Relief**.  FED. R. CIV. P. 23(b)(2):  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief with respect to the Classes as a whole.

128.    **Superiority**.  FED. R. CIV. P. 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.  Even if members of the Classes could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    CLAIMS FOR RELIEF

**COUNT I**
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**CAL. CIV. CODE § 1750, et seq.**
**(On Behalf of the Nationwide Class and the California Class)**

129.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

130.    Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

131.    CAL. CIV. CODE § 1750, *et seq.*, the CLRA, "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

132.    Plaintiffs and members of the Nationwide and California Classes are "consumers" within the meaning of the CLRA, CAL. CIV. CODE § 1761(d).

133.    Defendant is a "person" within the meaning of the CLRA, CAL. CIV. CODE § 1761(c).

134.   AMD's processors are "goods" within the meaning of the CLRA, CAL. CIV. CODE § 1761(a).

135.   Plaintiffs, the Nationwide Class, and the California Class's purchase or lease of AMD processors, or devices containing AMD processors, are "transactions" within the meaning of the CLRA, CAL. CIV. CODE § 1761(e).

136.   Defendant violated the CLRA by misrepresenting the performance and security capabilities and features of its processors, and failing to disclose and omitting the existence of the Defect in its processors.  As such, Defendant violated the CLRA by:

(a)   "[r]epresenting that goods . . . have . . . characteristics, . . . uses, [and] benefits . . . that they do not have…" (CAL. CIV. CODE § 1770(a)(5));

(b)   "[r]epresenting that goods . . . are of a particular standard, quality, or grade…" (CAL. CIV. CODE § 1770(a)(7));

(c) "[a]dvertising goods . . . with intent not to sell them as advertised…" (CAL. CIV. CODE § 1770(a)(9)); and

(d) "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." (CAL. CIV. CODE § 1770(a)(16)).

137.   Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Nevertheless, Defendant failed to disclose and omitted the existence of the Defect in its processors.  Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiffs and members of the Nationwide and California Classes, but failed to do so.

138.   Defendant's scheme and concealment of the true characteristics of the AMD processors was material to Plaintiffs and the Nationwide and California Classes.  The Defect relates to the central functionality of the AMD processors as it affects the processors' ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information.  Plaintiffs and the Nationwide Class and the California Class used Defendant's products and had

business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

139. Defendant had a duty to disclose that the AMD processors were defective, because, having volunteered to provide information to Plaintiffs and the Nationwide and California Classes, Defendant had the duty to disclose not just the partial truth, but the entire truth.

140. Defendant intentionally and knowingly failed to disclose and misrepresented material facts regarding the AMD processors with intent to mislead Plaintiffs and members of the Nationwide and California Classes.

141. Defendant's deceptive conduct was likely to deceive a reasonable consumer, and did in fact deceive reasonable consumers including Plaintiffs and members of the Nationwide and California Classes.

142. Plaintiffs and members of the Nationwide and California Classes reasonably relied upon Defendant's material omissions and misrepresentations.  They had no way of knowing that Defendant's representations were false and misleading.  Plaintiffs and members of the Nationwide and California Classes did not (and could not) unravel Defendant's deception on their own.

143. The facts concealed and omitted by Defendant from Plaintiffs and members of the Nationwide and California Classes are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the AMD processors (or devices containing AMD processors) or pay a lower price.  Had Plaintiffs and the Nationwide and California Class members known about the defective nature of AMD processors, they would not have purchased or leased the AMD processors (or devices containing AMD processors), or would not have paid the prices they paid.

144. Defendant's unlawful acts and practices affect the public interest and trade and commerce in the State of California, and present a continuing risk to Plaintiff and members of the Nationwide and California Classes.

145. Defendant's violations of the CLRA were willful and oppressive.  Defendant knew or should have known that its conduct violated the CLRA.

146.    Plaintiffs and members of the Nationwide and California Classes were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendant's conduct in that respective class members overpaid for their AMD processors and did not receive the benefit of their bargain, and their AMD processors (or devices containing AMD processors) have suffered a diminution in value.  These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

147.    Plaintiffs and members of the Nationwide and California Classes are entitled to, *inter alia*, injunctive relief, costs, attorneys' fees, and other such relief the Court deems appropriate, just, and equitable, in amounts to be determined at trial.

148.    With this filing, and on this Count, pursuant to CAL. CIV. CODE § 1782(d), Plaintiffs and members of the Nationwide and California Classes seek an order enjoining the above-described unfair and deceptive practices.

149.    Plaintiffs and members of the Nationwide and California Classes have provided Defendant with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a), which is attached hereto as **Exhibit A**.  Thirty days having expired and Defendant having failed to provide the requested relief, Plaintiffs seek actual damages under the CLRA.

<u>**COUNT II**</u>
<u>**Violation of California's Unfair Competition Law ("UCL") – Unlawful Business Practice**</u>
<u>**CAL. BUS. & PROF. CODE § 17200, *et seq.***</u>
<u>**(On Behalf of the Nationwide Class and the California Class)**</u>

150.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

151.    Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

152.    CAL. BUS. & PROF. CODE § 17200, *et seq.*, the UCL, prohibits "any unlawful, unfair or fraudulent business act or practice."

153.    By reason of the conduct alleged herein, Defendant engaged in unlawful business practices within the meaning of the UCL.

154.     At all relevant times, Defendant has maintained substantial operations in, regularly conducted business throughout, and engaged in the conduct described herein within the State of California.

155.     In the course of its business, Defendant specifically violated the UCL by engaging in the following unlawful business acts and practices:

(a)     Violating the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.;

(b)     Violating the Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq*.; and

(c)     Violating California's False Advertising Law, CAL. BUS. & PROF. CODE § 1700, *et seq*.

156.     Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Nevertheless, Defendant failed to disclose the existence of the Defect in its processors.  Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiffs and members of the Nationwide and California Classes, but failed to do so.

157.     Defendant's unlawful business practices were likely to deceive a reasonable consumer.  Plaintiffs and members of the Nationwide and California Classes used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

158.     Defendant's unlawful business practices and concealment of the true characteristics of the AMD processors were material to Plaintiffs and members of the Nationwide and California Classes.  The Defect relates to the central functionality of the AMD processors as it affects the processor's ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information.

159.     Defendant misrepresented and failed to disclose the truth with the intention that Plaintiffs and members of the Nationwide and California Classes would rely on the misrepresentations and omissions.  Had they known the truth, Plaintiffs and members of the

Nationwide and California Classes would not have purchased or leased – or would have paid significantly less for – AMD processors (or devices containing AMD processors).

160.    As a direct and proximate result of Defendant's misrepresentations and failure to disclose material information, Plaintiffs and members of the Nationwide and California Classes have suffered ascertainable loss and actual damages.

161.    The harm caused by this conduct vastly outweighs any legitimate business utility it possibly could have.

162.    As a direct and proximate result of Defendant's unlawful business practices, Plaintiffs and members of the Nationwide and California Classes have suffered loss of money.

163.    As a result of Defendant's unlawful business practices, Plaintiffs and members of the Nationwide and California Classes are entitled to restitution, including disgorgement of profits, costs, and attorneys' fees in amounts to be determined at trial.

164.    Defendant's conduct is or may well be continuing and ongoing.   Accordingly, Plaintiffs and members of the Nationwide and California Classes are entitled to injunctive relief to prohibit or correct such ongoing acts of unfair competition, in addition to obtaining equitable monetary relief.

### COUNT III
### Violation of California's UCL – Unfair Business Practice
### CAL. BUS. & PROF. CODE § 17200, *et seq.*
### (On Behalf of the Nationwide Class and the California Class)

165.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

166.     Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

167.    Cal. Bus. & Prof. Code § 17200, *et seq.*, the UCL, prohibits "any unlawful, unfair or fraudulent business act or practice."

168.    By reason of the conduct alleged herein, Defendant engaged in unfair practices within the meaning of the UCL.

169.     At all relevant times, Defendant has maintained substantial operations in, regularly conducted business throughout, and engaged in the conduct described herein within the State of California.

170.     In the course of its business, Defendant specifically violated the UCL by engaging in the following unfair business acts and practices:

> (a)     selling or leasing the AMD processors (either directly or as a component of devices containing such processors), to Plaintiffs and members of the Nationwide and California Classes, either directly or indirectly through third-parties, with knowledge of the Defect in the AMD processors, and failing to disclose the Defect from Plaintiffs and members of the Nationwide and California Classes; and

> (b)     marketing the AMD processors as secure and of particular processing speeds, and misrepresenting the security and processing speeds of the AMD processors.

171.     **Defendant engaged in unfair business practices under the "balancing test."**  The harm caused by Defendant's actions and omissions, as described above, greatly outweigh any perceived utility.  Indeed, Defendant's failure to disclose the Defect with its processors has no utility, and therefore does not outweigh the harm Plaintiffs suffered as a result of the defective processors.

172.     Defendant's actions and omissions were injurious to Plaintiffs and members of the Nationwide and California Classes, directly causing the harms alleged.

173.     **Defendant engaged in unfair business practices under the "tethering test."**  Defendant's actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature.  *See, e.g.*, CAL. BUS. & PROF. CODE § 17500 (California legislative policy against false advertising); CAL. CIV. CODE § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them.... The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); CAL. CIV. CODE § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."). Defendants' acts and omissions, and the injuries caused by them are thus "comparable to or the same

as a violation of the law . . . ." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

174.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Nevertheless, Defendant failed to disclose the existence of the Defect in its processors.  Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiffs and members of the Nationwide and California Classes, but failed to do so.

175.    Defendant's unfair business practices were likely to deceive a reasonable consumer. Plaintiffs and members of the Nationwide and California Classes used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

176.    Defendant's unfair business practices and failure to disclose the true characteristics of the AMD processors were material to Plaintiffs and members of the Nationwide and California Classes.  The Defect relates to the central functionality of the AMD processors as it affects the processor's ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information.

177.    Defendant misrepresented and failed to disclose the truth with the intention that Plaintiffs and members of the Nationwide and California Classes would rely on the misrepresentations and omissions.  Had they known the truth, Plaintiffs and members of the Nationwide and California Classes would not have purchased or leased – or would have paid significantly less for–AMD processors (or devices containing AMD processors).

178.    As a direct and proximate result of Defendant's misrepresentations and failure to disclose material information, Plaintiffs and members of the Nationwide and California Classes have suffered ascertainable loss and actual damages.

179.    The harm caused by this conduct vastly outweighs any legitimate business utility it possibly could have.

180.    Plaintiffs and members of the Nationwide and California Classes are entitled to restitution, including disgorgement of profits, costs, and attorneys' fees in amounts to be determined at trial.

181.    Defendant's conduct is or may well be continuing and ongoing.  Accordingly, Plaintiffs and members of the Nationwide and California Classes are entitled to injunctive relief to prohibit or correct such ongoing acts of unfair competition, in addition to obtaining equitable monetary relief.

**COUNT IV**
**Violation of California's UCL – Fraudulent Business Practice**
**CAL. BUS. & PROF. CODE § 17200, *et seq.***
**(On Behalf of the Nationwide Class and the California Class)**

182.    Plaintiffs reallege and incorporate by reference all preceding allegations as through fully set forth herein.

183.    Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

184.    CAL. BUS. & PROF. CODE § 17200, *et seq.*, the UCL, prohibits "any unlawful, unfair or fraudulent business act or practice."

185.    By reason of the conduct alleged herein, Defendant engaged in fraudulent business practices within the meaning of the UCL.

186.    At all relevant times, Defendant has maintained substantial operations in, regularly conducted business throughout, and engaged in the conduct described herein within the State of California.

187.    In the course of its business, Defendant specifically violated the UCL by engaging in the following fraudulent business act or practice:

(a)    selling or leasing the AMD processors (either directly or as a component of devices containing such processors), to Plaintiffs and members of the Nationwide and California Classes, either directly or indirectly through third-parties, with knowledge of the Defect in the AMD processors, and failing to disclose the Defect to Plaintiffs and members of the Nationwide and California Classes;

(b)      omitting the fact in Defendant's public statements, statements to third-party retailers, and on the packaging of its processors that AMD processors were capable of achieving particular speeds only if the data of Plaintiffs and members of the Nationwide and California Classes were made vulnerable to side-channel attacks, with the intent that those statements be relied upon;  and

(c)      knowingly and falsely stating that "there is a near zero risk to AMD processors" following the public exposure of the Spectre vulnerability and only correcting that false statement on January 11, 2018.

188.    Defendant's statements regarding the speed and/or security of its processors were objectively verifiable statements of fact, and not mere puffery.

189.    The who, what, where, when, and why of Defendant's fraudulent business practices are as follows:

(a)      **Who:**  Defendant AMD;

(b)      **What:**  Defendant affirmatively misrepresented and failed to disclose the true security and processing speed of its processors;

(c)      **Where:**  Defendant made its affirmative misrepresentations to Plaintiffs and members of the Nationwide and California Classes on its packaging for its processors, on the packaging by third-party computer and server manufacturers, on in-store displays communicated to retailers by AMD or its authorized manufacturers (*e.g.*, Fry's), and online (*e.g.*, Newegg.com);

(d)      **When:**  July 6, 2013, September 26, 2014, April 21, 2016, and January 6, 2018; and

(e)      **Why:**  Because, contrary to AMD's representations and omissions, AMD processors are not secure and are only capable of working at the speed and with the performance as promised at the expense of a significant security vulnerability.

190.    Defendant was provided notice of the Defect by independent research teams no later than June 2017, and knew, or should have known, of the existence of the Defect much earlier. Nevertheless, Defendant failed to disclose the existence of the Defect in its processors.  Defendant

owed a duty to disclose the material fact that its processors were defective to Plaintiffs and members of the Nationwide and California Classes, but failed to do so.

191.    Defendant's fraudulent business practices were likely to deceive a reasonable consumer.  Plaintiffs and members of the Nationwide and California Classes used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

192.    Defendant's scheme and failure to disclose the true characteristics of the AMD processors were material to Plaintiffs and members of the Nationwide and California Classes, as evidence by, among other things, the massive public outcry once the Defect was disclosed.  Moreover, the Defect relates to the central functionality of the AMD processors as it affects the processor's ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information.

193.    Defendant misrepresented and failed to disclose the truth with the intention that Plaintiffs and members of the Nationwide and California Classes would rely on the misrepresentations and omissions.  Had they known the truth, Plaintiffs and members of the Nationwide and California Classes would not have purchased or leased – or would have paid significantly less for – AMD processors (or devices containing AMD processors).

194.    As a direct and proximate result of Defendant's misrepresentations and failure to disclose material information, Plaintiffs and members of the Nationwide and California Classes have suffered ascertainable loss and actual damages.

195.    Plaintiffs and members of the Nationwide and California Classes are entitled to restitution, including disgorgement of profits, costs, and attorneys' fees in amounts to be determined at trial.

196.    Defendant's conduct is or may well be continuing and ongoing.  Accordingly, Plaintiffs and members of the Nationwide and California Classes are entitled to injunctive relief to prohibit or correct such ongoing acts of unfair competition, in addition to obtaining equitable monetary relief.

1

## COUNT V
## Fraud by Omission
## (On Behalf of the Nationwide Class and the California Class)

197.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

198.    Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves and the Nationwide and California Classes.

199.    Defendant intentionally and knowingly omitted material facts about the AMD processors, including the fact the processors have significant security vulnerabilities and that the advertised processer speeds were not available without rendering the processors vulnerable to side-channel attacks which expose users' private information to potential hacking through such side-channel attacks.

200.    Defendant acted with the intent that Plaintiffs and members of the Classes rely on Defendant's omissions so that Defendant could profit from the sale of the processors.

201.    Specifically, Defendant's fraudulent omissions include, but are not limited to:

(a)      selling or leasing the AMD processors (either directly or as a component of devices containing such processors), to Plaintiffs and members of the Nationwide and California Classes, either directly or indirectly through third-parties, with knowledge of the Defect in the AMD processors, and failing to disclose the Defect to Plaintiffs and members of the Nationwide and California Class;

(b)      omitting the fact in Defendant's public statements, statements to third-party retailers, and on the packaging of its processors that AMD processors were capable achieving particular speeds only if the data of Plaintiffs and members of the Nationwide and California Classes were made vulnerable to side-channel attacks, with the intent that those statements and omissions be relied upon; and/or

(c)      failing to disclose that AMD processors were vulnerable to Spectre and only disclosing that fact publicly on January 11, 2018.

202.    Defendant's statements and omissions regarding the speed and/or security of its processors were objectively verifiable statements or omissions of fact, and not mere puffery.

---

203.    The who, what, where, and why of Defendant's fraudulent business practices are as follows:

(a)      **Who:**  Defendant AMD;

(b)      **What:**  Defendant affirmatively omitted the fact there are significant security vulnerabilities with the processors and that the speed of its processors was only available if consumers' data was left vulnerable;

(c)      **Where:**  Defendant omitted the existence of the Defect from Plaintiffs and members of the Nationwide and California Classes on its packaging for its processors, on the packaging by third-party computer and server manufacturers, on in-store or online displays communicated to retailers by AMD or its authorized retailers (*e.g.* Fry's, Newegg.com);

(d)      **Why:**  Because, contrary to AMD's omissions, AMD processors are not secure and are only capable of working at the speed and with the performance as promised at the expense of a significant security vulnerability.

204.    Defendant was provided notice of the Defect by independent research teams no later than June 2017, and knew, or should have known, of the existence of the Defect much earlier. Nevertheless, Defendant failed to disclose the existence of the Defect in its processors.  Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiffs and members of the Nationwide and California Classes, but failed to do so.

205.    Defendant owed a duty to disclose the Defect in its processors because Defendant possessed superior and exclusive knowledge regarding the defect and the vulnerability to which users' data was exposed.  Rather than disclose the defect, Defendant intentionally and knowingly omitted material facts including the existence of the Defect and that the represented processor speeds were only available at the expense at the expense of a significant security vulnerability in order to deceive consumers and sell additional processors and avoid the cost of repair or replacement of the defective processors.

206.    Defendant's fraudulent acts were likely to deceive a reasonable consumer.  Plaintiffs and members of the Nationwide and California Classes used Defendant's products and had business

dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

207.   Defendant's scheme and failure to disclose the true characteristics of the AMD processors were material to Plaintiffs and members of the Nationwide and California Classes, as evidence by, among other things, the massive public outcry once the Defect was disclosed.  Moreover, the Defect relates to the central functionality of the AMD processors as it affects the processor's ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information.   Defendant knew its omissions were misleading and knew the effect of those omissions.

208.   Defendant failed to disclose the truth with the intention that Plaintiffs and members of the Nationwide and California Classes would rely on the omissions.  Had they known the truth, Plaintiffs and members of the Nationwide and California Classes would not have purchased or leased – or would have paid significantly less for–AMD processors (or devices containing AMD processors).

209.   As a direct and proximate result of Defendant's failure to disclose material information, Plaintiffs and members of the Nationwide and California Classes have suffered actual damages, in an amount to be proven at trial.

**COUNT VI**
**Breach of Express Warranty – Limited Warranty**
**CAL. COM. CODE § 2313**
**(On Behalf of the Nationwide Class and the California Class)**

210.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

211.   Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

212.   Defendant is and was at all relevant times a "merchant" with respect to the AMD processors under CAL. COM. CODE § 2104(1), and a "seller" of the AMD processors under § 2103(1)(d).

213.   The AMD processors are and were at all relevant times "goods" within the meaning of CAL. COM. CODE § 2105(1).

214.     In connection with the purchase of AMD processors sold through the AMD processor in a Box Program, AMD provided a three-year limited warranty for processors sold with a heatsink/fan ("HSF") and a two-year limited warranty for processors sold without an HSF.  Both warranties cover defects in the material and workmanship of the AMD processors, and processors that fail to substantially conform to AMD's publicly available specifications.

215.     Plaintiffs and members of the Nationwide and California Classes experienced the existence of the Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendant.

216.     Plaintiffs and members of the Nationwide and California Classes could not have reasonably discovered the Defect in AMD processors prior to the public disclosure of the Defect by cybersecurity experts, or prior to experiencing a known security hack resulting from the Defect.

217.     Defendant breached the express warranty by selling AMD processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

218.     Because of the existence of the Defect, the AMD processors do not perform as warranted.

219.     Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

220.     Thus, Defendant's two-year and three-year limited warranties fail of their essential purpose and the recovery of Plaintiffs and members of the Nationwide and California Classes is not limited to the remedies of the express limited warranties.

221.    Any attempt by Defendant to disclaim or limit the express warranties *vis-à-vis* consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  This reasoning equally applies to any attempt to limit the warranties Defendant furnished directly to Plaintiff and members of the Nationwide and California Classes through its marketing campaign, regardless of whether Plaintiff and members of the Nationwide and California Classes purchased or leased their AMD processors, or devices containing such processors, through the AMD processor in a Box program.

222.    Furthermore, the time limits contained in the express limited warranties Defendant furnished in connection with the AMD processor in a Box Program were also unconscionable and inadequate to protect Plaintiffs and members of the Nationwide and California Classes.  Among other things, Plaintiffs and members of the Nationwide and California Classes did not determine these limitations, the terms of which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant and Plaintiffs and members of the Nationwide and California Classes, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

223.    Defendant knew that its processors were inherently defective and did not conform to their warranties.  Plaintiffs and members of the Nationwide and California Classes were induced into purchasing or leasing AMD processors, or devices containing AMD processors, under false pretenses.

224.    Plaintiffs and members of the Nationwide and California Classes have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

225.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and members of the Nationwide and California Classes have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced processor speeds, diminished value of their computer devices, and loss of use of or access to their computer devices.

1
2

**COUNT VII**
**Breach of Express Warranty -- Representations**
**CAL. COM. CODE § 2313**
**(On Behalf of the Nationwide Class and the California Class)**

3

226.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

4

fully set forth herein.

5

227.    Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs")

6

bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

7

228.    Defendant is and was at all relevant times a "merchant" with respect to the AMD

8

processors under CAL. COM. CODE § 2104(1), and a "seller" of the AMD processors under §

9

2103(1)(d).

10

229.    The AMD processors are and were at all relevant times "goods" within the meaning

11

of CAL. COM. CODE § 2105(1).

12

230.    Defendant marketed its processors to Plaintiffs and members of the Nationwide and

13

California Classes, and made affirmative representations, as regarding the security and processing

14

speeds of the processors.  Plaintiffs and members of the Nationwide and California Classes were

15

exposed to, and aware of, these representations.

16

231.    Defendant's express warranties formed the basis of the bargain in Plaintiffs', the

17

Nationwide Class', and the California Class's decision to purchase or lease AMD processors, or

18

devices containing AMD processors.  Defendant's various oral and written representations regarding

19

the AMD processors' security and processing speed constituted express warranties to Plaintiffs and

20

the Nationwide and California Classes.

21

232.    An affirmation of fact, promise, or description made by the seller to the buyer which

22

relates to the goods and becomes a part of the basis of the bargain creates an express warranty that

23

the goods will conform to the affirmation, promise, or description.

24

233.    Plaintiffs and members of the Nationwide and California Classes used Defendant's

25

products and had business dealings with Defendant either directly or indirectly through third-parties,

26

and were the intended recipients of Defendant's processors.  As such, Defendant's express warranty

27

regarding the benefits of the AMD processors extends directly to consumers like Plaintiffs and

28

members of the Nationwide and California Classes, who are intended third-party beneficiaries of any

1    contract between Defendant and the retailers where AMD processors, or devices with AMD

2    processors, were sold or leased.

3        234.   Defendant represented that its processors were secure and of particular processing

4    speeds.  AMD processors were not secure—given that they were subject to the Defect – and did not

5    operate at stated processing speeds given that patches necessary to mitigate the Defect result in

6    reduced processing performance.

7        235.   Plaintiffs and members of the Nationwide and California Classes experienced the

8    existence of the Defect in AMD processors but had no knowledge of the existence of the Defect,

9    which was known and concealed by Defendant.

10       236.   Plaintiffs and members of the Nationwide and California Classes could not have

11   reasonably discovered the Defect in AMD processors prior to the public disclosure of the Defect by

12   cybersecurity experts, or prior to experiencing a known security hack resulting from the Defect.

13       237.   Because of the existence of the Defect, the AMD processors do not perform as

14   warranted.

15       238.   Defendant was provided notice of the Defect by independent research teams, and

16   knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a

17   reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here

18   because Defendant has known of and concealed the Defect and, on information and belief, has refused

19   to adequately repair or replace its processors free of charge within or outside of the warranty periods

20   despite the Defect's existence at the time of sale or lease of the processors, or devices containing

21   AMD processors.

22       239.   Any attempt by Defendant to disclaim or limit the express warranties *vis-à-vis*

23   consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is

24   unenforceable because Defendant knowingly sold or leased a defective product without informing

25   customers about the Defect.  This reasoning equally applies to any attempt to limit the warranties

26   Defendant furnished directly to Plaintiff and members of the Nationwide and California Classes

27   through its marketing campaign, regardless of whether Plaintiff and members of the Nationwide and

28

California Classes purchased or leased their AMD processors, or devices containing such processors, through the AMD processor in a Box program.

240.   Furthermore, the time limits contained in in the express limited warranties Defendant furnished in connection with the AMD processor in a Box Program were also unconscionable and inadequate to protect Plaintiffs and members of the Nationwide and California Classes.  Among other things, Plaintiffs and members of the Nationwide and California Classes did not determine these limitations, the terms of which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant and Plaintiffs and members of the Nationwide and California Classes, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

241.   Defendant knew that its processors were inherently defective and did not conform to their warranties.  Plaintiffs and members of the Nationwide and California Classes were induced into purchasing or leasing AMD processors, or devices containing AMD processors, under false pretenses.

242.   Plaintiffs and members of the Nationwide and California Classes have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.  As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and members of the Nationwide and California Classes have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced processor speeds, diminished value of their computer devices, and loss of use of or access to their computer devices.

**COUNT VIII**
**Breach of Implied Warranty**
**CAL. COM. CODE §§ 23114 & 2315**
**(On Behalf of the Nationwide Class and the California Class)**

243.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

244.   Plaintiffs Elliott, Garcia, Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

245.    Defendant is and was at all relevant times a "merchant" with respect to the AMD processors under CAL. COM. CODE § 2104(1), and a "seller" of the AMD processors under § 2103(1)(d).

246.    The AMD processors are and were at all relevant times "goods" within the meaning of CAL. COM. CODE § 2105(1).

247.    A warranty that the AMD processors were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to CAL. COM. CODE § 2314.

248.    In addition, a warranty that the AMD processors were fit for their particular purpose is implied by law pursuant to CAL. COM. CODE § 2315.  Defendant knew at the time of sale of the AMD processors that Plaintiffs and members of the Nationwide and California Classes intended to use those processors in a manner requiring a particular standard of security and performance, and that Plaintiffs and members of the Nationwide and California Classes were relying on Defendant's skill and judgment to furnish suitable products for this particular purpose.

249.    Plaintiffs and members of the Nationwide and California Classes purchased or leased AMD processors, or devices containing AMD processors, from Defendant, by and through Defendant's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers or lessors of AMD processors when purchased or leased from a third party.  At all relevant times, Defendant was the manufacturer, distributor, warrantor, and/or seller of the relevant processors.  Defendant knew or had reason to know of the specific use for which its processors were purchased or leased.

250.    AMD processors, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose due to the Defect, and the associated problems and failures caused by the Defect.  Thus, Defendant breached its implied warranty of merchantability.

251.    Plaintiffs and members of the Nationwide and California Classes used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.  As such, Defendant's implied warranty regarding the benefits of the AMD processors extends directly to consumers like Plaintiffs and

members of the Nationwide and California Classes, who are intended third-party beneficiaries of any contract between Defendant and the retailers where AMD processors, or devices with AMD processors, were sold or leased.

252.    Defendant marketed its processors to Plaintiffs and members of the Nationwide and California Classes as secure and of particular processing speeds.  Plaintiffs and members of the Nationwide and California Classes were exposed to, and aware of, these representations.  Indeed, such representations formed the basis of their respective decisions to purchase or lease AMD processors, or devices containing AMD processors.

253.    The AMD processors were defective when they left Defendant's possession and, as such, could not perform according to Defendant's affirmative representations that the AMD processors were secure and of particular processing speeds.  Therefore, the AMD processors were not reasonably fit for their intended, anticipated, or reasonably foreseeable use.

254.    As a direct and proximate result of Defendant's breach of its implied warranty of merchantability, Plaintiffs and members of the Nationwide and California Classes have been damaged in an amount to be proven at trial.

255.    Defendant cannot disclaim its warranties implied by law as it knowingly sold or leased a defective product.

256.    Defendant was provided notice of the defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

257.    Any attempt by Defendant to disclaim or limit the implied warranty of merchantability *vis-à-vis* Plaintiffs and members of the Nationwide and California Classes is unconscionable and unenforceable.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  Among other

things, Plaintiffs and members of the Nationwide and California Classes did not participate in determining any warranty limitations, especially those which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant, and Plaintiffs, and members of the Nationwide and California Classes, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

258. Further, as a manufacturer of consumer goods, Defendant is precluded from excluding or modifying an implied warranty of merchantability or limiting customers' remedies for breach of this warranty.

259. Plaintiffs and members of the Nationwide and California Classes have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

260. Defendant's warranties were designed to influence consumers who purchased or leased its processors, including products that contain them.

261. Defendant is estopped by its conduct, as alleged herein, from disclaiming any and all implied warranties with respect to the defective processors.

262. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and Defendant's concealment.

**COUNT IX**
**Violation of the Magnuson-Moss Warranty Act ("MMWA"),**
**15 U.S.C. § 2301, *et seq.***
**(On Behalf of the Nationwide Class and the California Class)**

263. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

264. Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs") bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

265.    Plaintiffs and members of the Nationwide and the California Classes satisfy the MMWA's jurisdictional requirement because this action satisfies the diversity jurisdiction requirements under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

266.    Plaintiffs and members of the Nationwide and the California Classes are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

267.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

268.    AMD's processors are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

269.    The MMWA, 15 U.S.C. § 2310(d)(1), provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranties.

270.    Defendant provided Plaintiffs and members of the Nationwide and the California Classes with one or more express warranties, which are covered under the MMWA, 15 U.S.C. §2301(6).  In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant directly provided warranty coverage for its processors, or indirectly provided warranty coverage for its processors under one or more manufacturer's warranties.

271.    Through written advertisements, Defendant marketed its processors to the Plaintiffs and members of the Nationwide and California Classes as secure and of particular processing speeds. Indeed, such representations formed the basis of the bargain in Plaintiffs and members of the Nationwide and California Classes' decision to purchase or lease AMD processors, or devices containing AMD processors.

272.    Plaintiffs and members of the Nationwide and the California Classes experienced the existence of the Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendant, and have not been provided a suitable repair or replacement of the defective processors free of charge within a reasonable time.

273.    Defendant provided Plaintiffs and members of the Nationwide and the California Classes with one or more implied warranties, which are covered under the MMWA, 15 U.S.C. § 2301(7).

1       274.    In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant breached these warranties by misrepresenting the standard, quality, or grade of its processors, and failing to disclose and fraudulently concealing the existence of the Defect in its processors.  AMD processors share a common defect in design, workmanship, and manufacture that is prone to security vulnerabilities and fails to operate as represented by Defendant.

275.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs and members of the Nationwide and the California Classes resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

276.    Any attempt by Defendant to disclaim or limit its express or implied warranties *vis-à-vis* consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  Among other things, Plaintiffs and members of the Nationwide and California Classes did not participate in determining any warranty limitations, especially those which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant and Plaintiffs and members of the Nationwide and the California Classes, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

277.    Plaintiffs and members of the Nationwide and the California Classes would suffer economic hardship if they returned their AMD processors, or devices containing the AMD processors, but did not receive the return of all payments made by them to Defendant.  Thus, Plaintiffs

1    and members of the Nationwide and the California Classes have not reaccepted their AMD processors

2    by retaining them.

3         278.    The amount in controversy of Plaintiffs and members of the Nationwide and the

4    California Classes' individual claims meets or exceeds the sum of $25.  The amount in controversy

5    of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of

6    all claims to be determined in this lawsuit.

7         279.    Plaintiffs and members of the Nationwide and the California Classes, individually and

8    on behalf of the respective Classes, seek all damages permitted by law, including diminution in the

9    value of the AMD processors, in an amount to be proven at trial.

10                               **COUNT X**
                                **Negligence**
11   **(On Behalf of the Nationwide Class and the California Class.)**

12        280.    Plaintiffs reallege and incorporate by reference all preceding allegations as though

13   fully set forth herein.

14        281.    Plaintiffs Elliott, Garcia, and Martinelli (for the purposes of this section, "Plaintiffs")

15   bring this Count on behalf of themselves, the Nationwide Class, and the California Class.

16        282.    Defendant owed a duty of care to Plaintiffs and members of the Nationwide and

17   California Classes, arising from the sensitivity of information stored on computers and the

18   foreseeability of the impact of the Defect on data security, to exercise reasonable care in safeguarding

19   sensitive information.

20        283.    Defendant also had a duty to ensure that its processors would function at the quality

21   and processing speeds that it represented to customers, including Plaintiffs and members of the

22   Nationwide and California Classes.   This duty included, *inter alia*, designing, maintaining,

23   monitoring, and testing its processors to ensure that Plaintiff and members of the Nationwide and

24   California Classes' data and computers were adequately secured and that its processors would

25   function as promised.

26        284.    Defendant owed a duty to Plaintiffs and members of the Nationwide and California

27   Classes to implement processes that would detect major security vulnerabilities, such as the Defect,

28   in a timely manner.

285.    Defendant also owed a duty to disclose the material fact that its processors were defective.

286.    But for Defendant's breach of its duties, Plaintiffs and members of the Nationwide and California Classes would not have purchased or leased – or would have paid substantially less for – AMD processors (or devices containing AMD processors) had they known of the Defect and the reduction in processing performance associated with efforts necessary to mitigate the substantial security risks presented by the Defect.

287.    Plaintiffs and members of the Nationwide and California Classes were foreseeable victims of Defendant's wrongdoing, and Defendant knew, or should have known, that its processors would cause damages to class members.

288.    The defective AMD processors are installed into larger devices which, by virtue of the Defect, are then less secure, less valuable and/or more exposed to hackers accessing private data stored on such devices.  The fact that the defective AMD processors are installed into computers and other devices is material because Plaintiffs and members of the Nationwide and California Classes had a reasonable expectation that their devices containing an AMD processor would not suffer from a defect that would expose their users' information to hackers.  No reasonable consumer expects a computer or device containing an AMD processor to contain a defect that exposes their users' information to hackers.

289.    As a direct and proximate result of Defendant's negligence, Plaintiffs and members of the Nationwide and California Classes have been damaged in an amount to be proven at trial, including, but not limited to, compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT XI**
**Violation of FDUPTA**
**FLA. STAT. § 501.201, *et seq*.**
**(On Behalf of the Florida Class)**

290.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

291.    This Count is brought on behalf of Plaintiff Pollack (for the purposes of this section, "Plaintiff") and the Florida Class.

292.    The stated purpose of the FDUPTA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  FLA. STAT. § 501.202(2).

293.    Plaintiff and Florida Class members are each "consumers," the AMD processors are "goods," and Defendant is engaged in "trade or commerce" within the meaning of the statute.  FLA. STAT. § 501.203.

294.    FDUPTA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FLA. STAT. § 501.204(1).

295.    In the course of its business, Defendant violated FDUPTA by misrepresenting the performance, security capabilities, and features of its processors, and failing to disclose and fraudulently concealing the existence of the Defect in its processors.  Specifically, in marketing, offering for sale, and selling the AMD processors, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by FLA. STAT. § 501.204(1):

(a)    representing that the AMD processors have characteristics or benefits that they do not have;

(b)    representing that the AMD processors are of a particular standard and quality when they are not;

(c)    advertising goods the AMD processors with intent not to sell them as advertised;

(d)    engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(e)    using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale of the AMD processors.

296.     Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Nevertheless, Defendant failed to disclose and fraudulently concealed the existence of the Defect in its processors.  Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiff and members of the Florida Class, but failed to do so.

297.     Defendant's scheme and concealment of the true characteristics of the AMD processors was material to Plaintiff and the Florida Class, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Florida Class would rely on the misrepresentations, concealments, and omissions.  Had Plaintiff and the Florida Class members known about the defective nature of AMD processors, they would not have purchased or leased the AMD processors (or devices containing AMD processors) or would have paid significantly less for them.

298.     Plaintiff and the Florida Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

299.     Defendant had an ongoing duty to Plaintiff and the Florida Class to refrain from unfair and deceptive practices under FDUPTA in the course of its business.  Specifically, Defendant owed Plaintiff and the Florida Class members a duty to disclose all the material facts concerning the AMD processors because it intentionally concealed such material facts from Plaintiff and the Florida Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

300.     Defendant's deceptive conduct was likely to deceive a reasonable consumer and did in fact deceive reasonable consumers including Plaintiff and members of the Florida Class.

301.     Plaintiff and the Florida Class members were injured and suffered ascertainable loss and actual damage as a direct and proximate result of Defendant's conduct in that respective class members overpaid for their AMD processors (or devices containing AMD processors) and did not receive the benefit of their bargain, and their AMD processors (or devices containing AMD

processors) have suffered a diminution in value.  These injuries are the direct and natural consequence of Defendant's concealment, misrepresentations and/or omissions.

302.    Pursuant to FLA. STAT. § 501.211(1), Plaintiff and Florida Class members seek a declaratory judgment and Court Order enjoining Defendant's above-described wrongful acts and practices, and for damages, restitution, and disgorgement.  Additionally, pursuant to FLA. STAT. §§ 501.211(2) and 501.2105, Plaintiff and the Florida Class asserts claims for damages, attorney fees, and costs.

### COUNT XII
### Fraud by Omission
### (On Behalf of the Florida Class)

303.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

304.    This Count is brought on behalf of Plaintiff Pollack (for the purposes of this section, "Plaintiff") and the Florida Class.

305.    Defendant intentionally and knowingly omitted material facts about its AMD processors, including the fact that the processors have significant security vulnerabilities and that the advertised processer speeds were not available without rendering the processors vulnerable to side-channel attacks, which expose users' private information to potential hacking through such side-channel attacks.

306.    Defendant acted with the intent that Plaintiff and members of the Florida Class rely on Defendant's omissions so that Defendant could profit from the sale of the processors.

307.    Specifically, Defendant's fraudulent omissions include, but are not limited to:

(a)        selling or leasing the AMD processors (either directly or as a component of devices containing such processors), to Plaintiffs and members of the Florida Class, either directly or indirectly through third-parties, with knowledge of the Defect in the AMD processors, and failing to disclose the Defect to Plaintiffs and members of the Florida Class; and/or

(b)        omitting the fact in Defendant's public statements, statements to third-party retailers, and on the packaging of its processors that AMD processors were capable

achieving particular speeds only if the data of Plaintiffs and members of the Florida Class were made vulnerable to side-channel attacks, with the intent that those statements and omissions be relied upon;

(c)     failing to disclose that AMD processors were vulnerable to Spectre and only disclosing that fact publicly on January 11, 2018.

308.   Defendant's statements and omissions regarding the speed and/or security of its processors were objectively verifiable statements or omissions of fact, and not mere puffery.

309.   The who, what, where, and why of Defendant's fraudulent business practices are as follows:

(a)     **Who:** Defendant AMD;

(b)     **What:** Defendant affirmatively omitted the fact there are significant security vulnerabilities with the processors and that the speed of its processors was only available if consumers' data was left vulnerable;

(c)     **Where:** Defendant omitted the existence of the Defect from Plaintiffs and members of the Florida Class on its packaging for its processors, on the packaging by third-party computer and server manufacturers, on in-store or online displays communicated to retailers by AMD or its authorized retailers (*e.g.* Fry's, Newegg.com); and/or

(d)     **Why:** Because, contrary to AMD's omissions, AMD processors are not secure and are only capable of working at the speed and with the performance as promised at the expense of a significant security vulnerability.

310.   Defendant was provided notice of the Defect by independent research teams no later than June 2017, and knew, or should have known, of the existence of the Defect much earlier. Nevertheless, Defendant failed to disclose the existence of the Defect in its processors. Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiff and members of the Florida Class, but failed to do so.

311.   Defendant owed a duty to disclose the Defect in its processors because Defendant did not disclose that the advertised speeds for AMD processors were only available at the expense of a significant security vulnerability, which constitutes a partial disclosure. Rather than disclose the

defect, Defendant intentionally and knowingly omitted materials facts including the existence of the Defect and that the represented processor speeds were only available at the expense of a significant security vulnerability in order to deceive consumers and sell additional processors and avoid the cost of repair or replacement of the defective processors.

312.    Defendant's fraudulent acts were likely to deceive a reasonable consumer.  Plaintiff and members of the Florida Class used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

313.    Defendant's scheme and failure to disclose the true characteristics of the AMD processors were material to Plaintiff and members of the Florida Class, as evidence by, among other things, the massive public outcry once the Defect was disclosed.  Moreover, the Defect relates to the central functionality of the AMD processors as it affects the processor's ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information.  Defendant knew its omissions were misleading and knew the effect of those omissions.

314.    Defendant failed to disclose the truth with the intention that Plaintiff and members of the Florida Class would rely on the omissions.  Had they known the truth, Plaintiff and members of the Florida Class would not have purchased or leased – or would have paid significantly less for – AMD processors (or devices containing AMD processors).

315.    As a direct and proximate result of Defendant's failure to disclose material information, Plaintiff and members of the Florida Class have suffered actual damages, in an amount to be proven at trial.

**COUNT XIII**
**Breach of Express Warranty – Limited Warranty**
**FLA. STAT. § 672.313**
**(On Behalf of the Florida Class)**

316.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

317.    This Count is brought on behalf of Plaintiff Pollack (for the purposes of this section, "Plaintiff") and the Florida Class.

318.    Defendant is and was at all relevant times a "merchant" with respect to the AMD processors under FLA. STAT. § 672.104(1), and a "seller" of the AMD processors under § 672.103(1)(d).

319.    The AMD processors are and were at all relevant times "goods" within the meaning of FLA. STAT. § 672.105(1).

320.    In connection with the purchase of AMD processors sold through the AMD Processor in a Box Program, AMD provided a three-year limited warranty for processors sold with a heatsink/fan ("HSF") and a two-year limited warranty for processors sold without an HSF.  Both warranties cover defects in the material and workmanship of the AMD processors, and processors that fail to substantially conform to AMD's publicly available specifications.

321.    Plaintiff and members of the Florida Class experienced the existence of the Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendant.

322.    Plaintiff and the Florida Class could not have reasonably discovered the Defect in AMD processors prior to the public disclosure of the Defect by cybersecurity experts or prior to experiencing a known security hack resulting from the Defect.

323.    Defendant breached the express warranty by selling AMD processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

324.    Because of the existence of the Defect, the AMD processors do not perform as warranted.

325.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused

1   to adequately repair or replace its processors free of charge within or outside of the warranty periods

2   despite the Defect's existence at the time of sale or lease of the processors, or devices containing

3   AMD processors.

4        326.    Thus, Defendant's two-year and three-year limited warranties fail of their essential

5   purpose and the recovery of Plaintiff and members of the Nationwide and California Classes is not

6   limited to the remedies of the express limited warranties.

7        327.    Any attempt by Defendant to disclaim or limit the express warranties *vis-à-vis*

8   consumers is unconscionable and unenforceable here.   Specifically, any warranty limitation is

9   unenforceable because Defendant knowingly sold or leased a defective product without informing

10  customers about the Defect.   This reasoning equally applies to any attempt to limit the warranties

11  Defendant furnished directly to Plaintiff and members of the Florida Class through its marketing

12  campaign, regardless of whether Plaintiff and members of the Class purchased or leased their AMD

13  processors, or devices containing such processors, through the AMD processor in a Box program.

14       328.    Furthermore, the time limits contained in in the express limited warranties Defendant

15  furnished in connection with the AMD processor in a Box Program were also unconscionable and

16  inadequate to protect Plaintiff and members of the Florida Class.   Among other things, Plaintiff and

17  members of the Florida Class did not determine these limitations, the terms of which unreasonably

18  favor Defendant.   A gross disparity in bargaining power existed between Defendant and Plaintiff and

19  members of the Florida Class, and Defendant knew or should have known that its processors were

20  defective at the time of sale or lease of the processors, or devices containing AMD processors, and

21  that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in

22  reduced processing performance.

23       329.    Defendant knew that its processors were inherently defective and did not conform to

24  their warranties.   Plaintiff and members of the Florida Class were induced into purchasing or leasing

25  AMD processors, or devices containing AMD processors, under false pretenses.

26       330.    Plaintiff and members of the Florida Class have been excused from performance of

27  any warranty obligations as a result of Defendant's conduct described herein.

28

331.    Accordingly, Plaintiff and the Florida Class assert as remedies, all actual, incidental, and consequential damages as allowed.

332.    As a direct and proximate result of Defendant's breach of its express warranty, Plaintiff and the Florida Class members have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced processor speeds, diminished value of their computer devices, and loss of use of or access to their computer devices.

**COUNT XIV**
**Breach of Express Warranty -- Representations**
**FLA. STAT. §672.313**
**(On Behalf of the Florida Class)**

333.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

334.    This Count is brought on behalf of Plaintiff Pollack (for the purposes of this section, "Plaintiff") and the Florida Class.

335.    Defendant is and was at all relevant times a "merchant" with respect to the AMD processors under FLA. STAT. § 672.104(1), and a "seller" of the AMD processors under § 672.103(1)(d).

336.    The AMD processors are and were at all relevant times "goods" within the meaning of FLA. STAT. § 672.105(1).

337.    Defendant marketed its processors to Plaintiff and the members of the Florida Class, and made affirmative representations, as to the security and processing speeds of the processors. Plaintiff and the members of the Florida Class were exposed to, and aware of, these representations.

338.    Defendant's express warranties formed the basis of the bargain in Plaintiff and the Florida Class' decision to purchase or lease AMD processors, or devices containing such AMD processors. Defendant's various oral and written representations regarding the AMD processors' security and processing speed constituted express warranties to Plaintiff and the Florida Class.

339.   An affirmation of fact, promise, or description made by the seller to the buyer which relates to the goods and becomes a part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation, promise, or description.

340.   Defendant represented that its processors were secure and of particular processing speeds.  AMD processors were not secure – given that they were subject to the Defect – and did not operate at stated processing speeds given that patches necessary to mitigate the Defect result in reduced processing performance.

341.   Plaintiff and members of the Florida Class experienced the existence of the Defect in AMD processors but had no knowledge of the existence of the Defect, which was known and concealed by Defendant.

342.   Plaintiff and the Florida Class could not have reasonably discovered the Defect in AMD processors prior to the public disclosure of the Defect by cybersecurity experts or prior to experiencing a known security hack resulting from the Defect.

343.   Because of the existence of the Defect, the AMD processors do not perform as warranted.

344.   Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

345.   Any attempt by Defendant to disclaim or limit the express warranties *vis-à-vis* consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  This reasoning equally applies to any attempt to limit the warranties Defendant furnished directly to Plaintiff and members of the Florida Class through its marketing

campaign, regardless of whether Plaintiff and members of the Class purchased or leased their AMD processors, or devices containing such processors, through the AMD processor in a Box program.

346.    Furthermore, the time limits contained in in the express limited warranties Defendant furnished in connection with the AMD processor in a Box Program were also unconscionable and inadequate to protect Plaintiff and members of the Florida Class.  Among other things, Plaintiff and members of the Florida Class did not determine these limitations, the terms of which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant and Plaintiff and members of the Florida Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

347.    Defendant knew that its processors were inherently defective and did not conform to their warranties.  Plaintiff and members of the Florida Class were induced into purchasing or leasing AMD processors, or devices containing AMD processors, under false pretenses.

348.    Plaintiff and members of the Florida Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

349.    Accordingly, Plaintiff and the Florida Class assert as remedies, all actual, incidental, and consequential damages as allowed.  As a direct and proximate result of Defendant's breach of its express warranty, Plaintiff and the Florida Class members have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced processor speeds, diminished value of their computer devices, and loss of use of or access to their computer devices.

**COUNT XV**
**Violation of the MMWA**
**15 U.S.C. § 2301, *et seq*.**
**(On Behalf of the Florida Class)**

350.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

351.    This Count is brought on behalf of Plaintiff Pollack (for the purposes of this section, "Plaintiff") and the Florida Class.

352.    Plaintiff and the Florida Class members satisfy the MMWA's jurisdictional requirement because this action satisfies the diversity jurisdiction requirements under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

353.    Plaintiff and the members of the Florida Class are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

354.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

355.    AMD's processors are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

356.    The MMWA, 15 U.S.C. §2310(d)(1), provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

357.    Defendant provided Plaintiff and members of the Florida Class with one or more express warranties, which are covered under the MMWA, 15 U.S.C. § 2301(6).  In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant directly provided warranty coverage for its processors, or indirectly provided warranty coverage for its processors under one or more manufacturer's warranties.

358.    Through written advertisements, Defendant marketed its processors to the Plaintiff and members of the Florida Class as secure and of particular processing speeds.  Indeed, such representations formed the basis of the bargain in Plaintiff and the Florida Class' decision to purchase or lease AMD processors, or devices containing AMD processors.

359.    Plaintiff and members of the Florida Class experienced the existence of the Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendant, and have not been provided a suitable repair or replacement of the defective processors free of charge within a reasonable time.

360.    In connection with the purchase or lease of AMD processors, or of devices containing AMD processors, Defendant breached these warranties by misrepresenting the standard, quality, or grade of its processors, and failing to disclose and fraudulently concealing the existence of the Defect

in its processors.  AMD processors share a common defect in design, workmanship, and manufacture that is prone to security vulnerabilities and fail to operate as represented by Defendant.

361.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff and the members of the Florida Class resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

362.    Any attempt by Defendant to disclaim or limit its express or implied warranties vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  Among other things, Plaintiff members of the Florida Classes did not participate in determining any warranty limitations, especially those which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant on the one hand, and Plaintiff and members of the Florida Class on the other hand, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

363.    Plaintiff and members of the Florida Class would suffer economic hardship if they returned their AMD processors, or devices containing the AMD processors, but did not receive the return of all payments made by them to Defendant.  Thus, Plaintiff and the Florida Class members have not reaccepted their AMD processors by retaining them

364.    The amount in controversy of Plaintiff and the Florida Class' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

365.    Plaintiff and members of the Florida Class, individually and on behalf of the respective Classes, seek all damages permitted by law, including diminution in the value of the AMD processors, in an amount to be proven at trial.

**COUNT XVI**
**Negligence**
**(On Behalf of the Florida Class)**

366.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

367.    This Count is brought on behalf of Plaintiff Pollack (for the purposes of this section, "Plaintiff") and the Florida Class.

368.    Defendant owed a duty of care to Plaintiff and members of the Florida Class, arising from the sensitivity of information stored on computers and the foreseeability of the impact of the Defect on data security, to exercise reasonable care in safeguarding sensitive information.

369.    Defendant also had a duty to ensure that its processors would function at the quality and processing speeds that it represented to customers, including Plaintiff and members of the Florida Class.  This duty included, *inter alia*, designing, maintaining, monitoring, and testing its processors to ensure that Plaintiff and members of the Florida Class' data and computers were adequately secured and that its processors would function as promised.

370.    Defendant owed a duty to Plaintiff and members of the Florida Class to implement processes that would detect major security vulnerabilities, such as the Defect, in a timely manner.

371.    Defendant also owed a duty to disclose the material fact that its processors were defective.

372.    But for Defendant's breach of its duties, Plaintiff and members of the Florida Class would not have purchased or leased – or would have paid substantially less for – AMD processors (or devices containing AMD processors) had they known of the Defect and the reduction in processing performance associated with efforts necessary to mitigate the substantial security risks

presented by the Defect.  Moreover, Plaintiff and members of the Florida Class that purchased or leased AMD processors and separately installed those processors on a device, have suffered a diminution in value of such devices.

373.    Plaintiff and members of the Florida Class were foreseeable victims of Defendant's wrongdoing, and Defendant knew, or should have known, that its processors would cause damages to class members.

374.    The defective AMD processors are installed into larger devices which, by virtue of the Defect, are then less secure, less valuable and/or more exposed to hackers accessing private data stored on such devices.  The fact that the defective AMD processors are installed into computers and other devices is material because Plaintiffs and members of the Florida Class had a reasonable expectation that their devices containing an AMD processor would not suffer from a defect that would expose their users' information to hackers.  No reasonable consumer expects a computer or device containing an AMD processor to contain a defect that exposes their users' information to hackers.

375.    As a direct and proximate result of Defendant's negligence, Plaintiff and members of the Florida Class have been damaged in an amount to be proven at trial, including, but not limited to, compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT XVII**
**Warranty Against Redhibitory Defects**
**LA. CIV. CODE ANN. art. 2520, 2524 (2015)**
**(On Behalf of the Louisiana Class)**

376.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

377.    Plaintiff Hauck (for the purposes of this section, "Plaintiff") brings this Count on behalf of herself and the Louisiana Class.

378.    Defendant marketed its processors to Plaintiff and the Louisiana Class as secure and of particular processing speeds.  Indeed, such representations formed the basis of the bargain in Plaintiff's and the Louisiana Class' decision to purchase or lease AMD processors, or devices containing AMD processors.

379.    The AMD processors were defective when they left Defendant's possession and, as such, could not perform according to Defendant's affirmative representations that the AMD

processors were secure and of particular processing speeds.  Moreover, developing a permanent solution to the Defect may not be possible (without upgrading the hardware) and, even if possible, will negatively impact the performance of the AMD processors or the devices containing such processors.

380.    The Defect in the AMD processors render their use so inconvenient that Plaintiff and members of the Louisiana Class would not have purchased or leased the AMD processors, or devices containing AMD processors, had they known of the Defect.  Accordingly, Plaintiff and the Louisiana Class are entitled to obtain a rescission of the sale of the AMD processors.

381.    Alternatively, the Defect diminishes the usefulness of the AMD processors (or devices containing such processors) or their value so that Plaintiff and members of the Louisiana Class would still have bought the AMD processors (or devices containing such processors) but for a lesser price. Accordingly, Plaintiff and the Louisiana Class are entitled to obtain a reduction of the price.

382.    Defendant is liable as a bad faith seller for selling a defective product with knowledge of the Defect, and thus, is liable to Plaintiff and the Louisiana Class members for the price of the AMD processors, or of the devices containing such processors, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the AMD processors, or of the devices containing such processors, and attorneys' fees.  As the manufacturer of the AMD processors, Defendant is deemed to know that the AMD processors possessed a redhibitory defect.

383.    Additionally, a warranty that the AMD processors were fit for the ordinary purpose for which processors are used is implied by law pursuant to LA. CIV. CODE ANN. art. 2524.

384.    These AMD processors, when sold or leased and at all times thereafter, were not fit for the ordinary purpose for which processors are used.

385.    Plaintiff and the Louisiana Class members seek a judgment in their favor for all possible damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### COUNT XVIII
### Violation of the MMWA
### 15 U.S.C. § 2301, *et seq.*
### (On Behalf of the Louisiana Class)

386.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

387.    Plaintiff Hauck (for the purposes of this section, "Plaintiff") brings this Count on behalf of herself and the Louisiana Class.

388.    Plaintiff and the Louisiana Class members satisfy the MMWA's jurisdictional requirement because this action satisfies the diversity jurisdiction requirements under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

389.    Plaintiff and the Louisiana Class members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

390.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

391.    The AMD processors described above are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

392.    The MMWA, 15 U.S.C. § 2310(d)(1), provides a cause of action for any consumer who is damaged by, among other things, the failure of a warrantor to comply with written or implied warranties.

393.    Defendant sells and leases the AMD processors subject to implied (including statutory) warranties within the meaning of the MMWA, 15 U.S.C. § 2301(7).

394.    Through written advertisements, Defendant marketed its processors to Plaintiff and the Louisiana Class members as secure and of particular processing speeds.  Indeed, such representations formed the basis of the bargain in Plaintiff's and the Louisiana Class' decision to purchase or lease AMD processors, or devices containing AMD processors.

395.    AMD processors were not secure – given that they were subject to the Defect – and did not operate at stated processing speeds given that patches necessary to mitigate the Defect result in reduced processing performance.

---

396.     Plaintiff and members of the Louisiana Class experienced the existence of the Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendant, and have not been provided a suitable repair or replacement of the defective processors free of charge within a reasonable time.

397.     Defendant provided Plaintiff and members of the Louisiana Class with one or more implied warranties, which are covered under the MMWA, 15 U.S.C. § 2301(7).

398.     In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant breached these warranties by misrepresenting the standard, quality, or grade of its processors, and failing to disclose and fraudulently concealing the existence of the Defect in its processors.  AMD processors share a common defect in design, workmanship, and manufacture that is prone to security vulnerabilities and fails to operate as represented by Defendant.  The AMD processors were defective when they left Defendant's possession and, as such, could not perform according to Defendant's affirmative representations that the AMD processors were secure and of particular processing speeds.  Moreover, developing a permanent solution to the Defect may not be possible (without upgrading the hardware) and, even if possible, will negatively impact the performance of the AMD processors or the devices containing such processors.

399.     Plaintiff and the Louisiana Class members used Defendant's products and had business dealings with Defendant, either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

400.     Defendant breached the express warranty by selling AMD processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

401.     When Plaintiff and the Louisiana Class purchased or leased the AMD processors, or devices containing such processors, Defendant warranted that the processors were fit for their ordinary purpose for which they intended to be used.

402.    Defendant has breached its implied warranties by failing to disclose and repair the Defect in the AMD processors, and by selling or leasing AMD processors that are unfit for their ordinary purposes.

403.    Any attempt by Defendant to disclaim or limit its express or implied warranties *vis-à-vis* consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  Among other things, Plaintiff and members of the Louisiana Class did not participate in determining any warranty limitations, especially those which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant and Plaintiff and members of the Louisiana Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

404.    Plaintiff and members of the Nationwide and the Louisiana Class would suffer economic hardship if they returned their AMD processors, or devices containing the AMD processors, but did not receive the return of all payments made by them to Defendant.  Thus, Plaintiff and members of the Louisiana Class have not reaccepted their AMD processors by retaining them.

405.    The amount in controversy of Plaintiff's and the Louisiana Class' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

406.    Plaintiff and the Louisiana Class members seek all damages permitted by law, including diminution in value of their AMD processors, or devices containing such processors, in an amount to be proven at trial.

**COUNT XIX**
**Violation of the Massachusetts Consumer Protection Act**
**MASS. GEN. LAWS ch. 93A, § 1, *et seq.***
**(On Behalf of the Massachusetts Class)**

407.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

408.    Plaintiff Caskey-Medina (for the purposes of this section, "Plaintiff") brings this Count on behalf of himself and the Massachusetts Class.

409.    Defendant, Plaintiff, and members of the Massachusetts Class are "persons" within the meaning of MASS. GEN. LAWS Ch. 93A, § 1(a).

410.    Defendant engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS Ch. 93A, § 1(b).

411.    The Massachusetts Consumer Protection Act (the "MCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS Ch. 93A, § 2.

412.    In the course of its business, Defendant violated the MCPA by misrepresenting the performance and security capabilities and features of its processors, and failing to disclose and omitting the existence of the Defect in its processors. As such, Defendant violated the Massachusetts Act by:

(a)      representing that the AMD processors have characteristics, uses, benefits, or qualities that they do not have;

(b)      representing that the AMD processors are of a particular standard, quality, and grade when they are not; and/or

(c)      advertising the AMD processors with the intent not to sell them as advertised.

413.    Defendant failed to disclose and omitted the existence of the Defect in its processors. Defendant owed a duty to disclose the material fact that its processors were defective to Plaintiff and members of the Massachusetts Class, but failed to do so.

414.    Defendant's scheme and concealment of the true characteristics of the AMD processors was material to Plaintiff and members of the Massachusetts Class. The Defect relates to

the central functionality of the AMD processors as it affects the processors' ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information.  Plaintiff and members of the Massachusetts Class used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

415.    Defendant had a duty to disclose that the AMD processors were defective, because, having volunteered to provide information to Plaintiff and the Massachusetts Class, Defendant had the duty to disclose not just the partial truth, but the entire truth.

416.    Defendant intentionally and knowingly failed to disclose and misrepresented material facts regarding the AMD processors with intent to mislead Plaintiff and members of the Massachusetts Class.

417.    Defendant's deceptive conduct was likely to deceive a reasonable consumer, and did in fact deceive reasonable consumers including Plaintiff and members of the Massachusetts Class.

418.    Plaintiff and members of the Massachusetts Class reasonably relied upon Defendant's material omissions and misrepresentations.  They had no way of knowing that Defendant's representations were false and misleading.  Plaintiff and members of the Massachusetts Class did not (and could not) unravel Defendant's deception on their own.

419.    The facts concealed and omitted by Defendant from Plaintiff and members of the Massachusetts Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the AMD processors (or devices containing AMD processors) or pay a lower price.  Had Plaintiff and members of the Massachusetts Class known about the defective nature of AMD processors, they would not have purchased or leased the AMD processors (or devices containing AMD processors), or would not have paid the prices they paid.

420.    Plaintiff and members of the Massachusetts Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's conduct.  Pursuant to MASS. GEN. LAWS Ch. 93A, § 9, Plaintiff and members of the Massachusetts Class seek monetary relief against Defendant measures as the greater of (a) actual damages in an amount to be determined at trial and

(b) statutory damages in the amount of $25 for Plaintiff and each member of the Massachusetts Class. Because Defendant's conduct was committed willfully and knowingly, Plaintiff and members of the Massachusetts Class are entitled to recover, for Plaintiff and each member of the Massachusetts Class, up to three times actual damages, but no less than two times actual damages.

421.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  In addition, on June 13, 2018, a notice letter was sent on behalf of Plaintiff and the members of the Massachusetts Class to Defendant.  Because Defendant does not maintain a place of business or keep assets within the Commonwealth of Massachusetts, this claim may be pursued without awaiting thirty days from the notice, pursuant to MASS. GEN. LAWS Ch. 93A, § 9(3).

## COUNT XX
### Fraud by Omission
### (On Behalf of the Massachusetts Class)

422.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

423.    This Count is brought on behalf of Plaintiff Mr. Caskey-Medina (for the purposes of this section, "Plaintiff") and the Massachusetts Class.

424.    Defendant intentionally and knowingly omitted material facts about its AMD processors, including the fact that the processors have significant security vulnerabilities and that the advertised processer speeds were not available without rendering the processors vulnerable to side-channel attacks, which expose users' private information to potential hacking through such side-channel attacks.

425.    Defendant acted with the intent that Plaintiff and members of the Massachusetts Class rely on Defendant's omissions so that Defendant could profit from the sale of the processors.

426.    Specifically, Defendant's fraudulent omissions include, but are not limited to:

(a)       selling or leasing the AMD processors (either directly or as a component of devices containing such processors), to Plaintiffs and members of the Massachusetts Class, either directly or indirectly through third-parties, with knowledge of the Defect in the AMD

1    processors, and failing to disclose the Defect to Plaintiffs and members of the Massachusetts

2    Class; and/or

3        (b)      omitting the fact in Defendant's public statements, statements to third-party

4    retailers, and on the packaging of its processors that AMD processors were capable

5    achieving particular speeds only if the data of Plaintiffs and members of the Massachusetts

6    Class were made vulnerable to side-channel attacks, with the intent that those statements

7    and omissions be relied upon;

8        (c)      failing to disclose that AMD processors were vulnerable to Spectre and only

9    disclosing that fact publicly on January 11, 2018.

10       427.    Defendant's statements and omissions regarding the speed and/or security of its

11   processors were objectively verifiable statements or omissions of fact, and not mere puffery.

12       428.    The who, what, where, and why of Defendant's fraudulent business practices are as

13   follows:

14       (a)      **Who:**  Defendant AMD;

15       (b)      **What:**  Defendant affirmatively omitted the fact there are significant security

16   vulnerabilities with the processors and that the speed of its processors was only available if

17   consumers' data was left vulnerable;

18       (c)      **Where:**  Defendant omitted the existence of the Defect from Plaintiffs and

19   members of the Massachusetts Class on its packaging for its processors, on the packaging

20   by third-party computer and server manufacturers, on in-store or online displays

21   communicated to retailers by AMD or its authorized retailers (*e.g.* Fry's, Newegg.com);

22   and/or

23       (d)      **Why:**  Because, contrary to AMD's omissions, AMD processors are not

24   secure and are only capable of working at the speed and with the performance as promised

25   at the expense of a significant security vulnerability.

26       429.    Defendant was provided notice of the Defect by independent research teams no later

27   than June 2017, and knew, or should have known, of the existence of the Defect much earlier.

28   Nevertheless, Defendant failed to disclose the existence of the Defect in its processors.  Defendant

owed a duty to disclose the material fact that its processors were defective to Plaintiff and members of the Massachusetts Class, but failed to do so.

430.    Defendant owed a duty to disclose the Defect in its processors because Defendant did not disclose that the advertised speeds for AMD processors were only available at the expense of a significant security vulnerability, which constitutes a partial disclosure.  Rather than disclose the Defect, Defendant intentionally and knowingly omitted materials facts including the existence of the Defect and that the represented processor speeds were only available at the expense of a significant security vulnerability in order to deceive consumers and sell additional processors and avoid the cost of repair or replacement of the defective processors.

431.    Defendant's fraudulent acts were likely to deceive a reasonable consumer.  Plaintiff and members of the Massachusetts Class used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.

432.    Defendant's scheme and failure to disclose the true characteristics of the AMD processors were material to Plaintiff and members of the Massachusetts Class, as evidence by, among other things, the massive public outcry once the Defect was disclosed.  Moreover, the Defect relates to the central functionality of the AMD processors as it affects the processor's ability to ensure effective and efficient performance of a computer or similar device, and to maintain sufficient data security to adequately process, communicate, and store sensitive and confidential information. Defendant knew its omissions were misleading and knew the effect of those omissions.

433.    Defendant failed to disclose the truth with the intention that Plaintiff and members of the Massachusetts Class would rely on the omissions.  Had they known the truth, Plaintiff and members of the Massachusetts Class would not have purchased or leased–or would have paid significantly less for–AMD processors (or devices containing AMD processors).

434.    As a direct and proximate result of Defendant's failure to disclose material information, Plaintiff and members of the Massachusetts Class have suffered actual damages, in an amount to be proven at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT XXI**
**Breach of Express Warranty – Limited Warranty**
**MASS. GEN. LAWS ch. 106, § 2-313.**
**(On Behalf of the Massachusetts Class)**

435.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

436.    Plaintiff Caskey-Medina (for the purposes of this section, "Plaintiff") brings this Count on behalf of himself and the Massachusetts Class.

437.    Defendant is and was at all relevant times a "merchant" with respect to the AMD processors under MASS. GEN. LAWS ch. 106 § 2-104(1), and a "seller" of the AMD processors under MASS. GEN. LAWS ch. 106 § 2-103(1)(d).

438.    The AMD processors are and were at all relevant times "goods" within the meaning of MASS. GEN. LAWS ch. 106 § 2-105(1).

439.    In connection with the purchase of AMD processors sold through the AMD processor in a Box Program, AMD provided a three-year limited warranty for processors sold with a heatsink/fan ("HSF") and a two-year limited warranty for processors sold without an HSF.  Both warranties cover defects in the material and workmanship of the AMD processors, and processors that fail to substantially conform to AMD's publicly available specifications.

440.    Plaintiff and members of the Massachusetts Class used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.  As such, Defendant's express warranty regarding the benefits of the AMD processors extends directly to consumers like Plaintiff and members of the Massachusetts Class, who are intended third-party beneficiaries of any contract between Defendant and the retailers where AMD processors, or devices with AMD processors, were sold or leased.

441.    Plaintiff and members of the Massachusetts Class experienced the existence of the Defect in AMD processors within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendant.

442.    Plaintiff and the Massachusetts Class could not have reasonably discovered the Defect in AMD processors prior to the public disclosure of the Defect by cybersecurity experts or prior to experiencing a known security hack resulting from the Defect.

443.    Defendant breached the express warranty by selling AMD processors that were defective with respect to design, workmanship, and manufacture when Defendant knew its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

444.    Because of the existence of the Defect, the AMD processors do not perform as warranted.

445.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

446.    Thus, Defendant's two-year and three-year limited warranties fail of their essential purpose and the recovery of Plaintiff and members of the Massachusetts Class is not limited to the remedies of the express limited warranties.

447.    Any attempt by Defendant to disclaim or limit the express warranties *vis-à-vis* consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  This reasoning equally applies to any attempt to limit the warranties Defendant furnished directly to Plaintiff and members of the Massachusetts Class through its marketing campaign, regardless of whether Plaintiff and members of the Massachusetts Class purchased or leased their AMD processors, or devices containing such processors, through the AMD processor in a Box program.

448.    Furthermore, the time limits contained in in the express limited warranties Defendant furnished in connection with the AMD processor in a Box Program were also unconscionable and inadequate to protect Plaintiff and members of the Massachusetts Class.  Among other things, Plaintiff and members of the Massachusetts Class did not determine these limitations, the terms of

which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant and Plaintiff and members of the Massachusetts Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

449.    Defendant knew that its processors were inherently defective and did not conform to their warranties.  Plaintiff and members of the Massachusetts Class were induced into purchasing or leasing AMD processors, or devices containing AMD processors, under false pretenses.

450.    Plaintiff and members of the Massachusetts Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

451.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Massachusetts Class have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced processor speeds, diminished value of their computer devices, and loss of use of or access to their computer devices.

**COUNT XXII**
**Breach of Express Warranty – Representations**
**MASS. GEN. LAWS ch. 106, § 2-313.**
**(On Behalf of the Massachusetts Class)**

452.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

453.    Plaintiff Caskey-Medina (for the purposes of this section, "Plaintiff") brings this Count on behalf of himself and the Massachusetts Class.

454.    Defendant is and was at all relevant times a "merchant" with respect to the AMD processors under MASS. GEN. LAWS ch. 106 § 2-104(1), and a "seller" of the AMD processors under MASS. GEN. LAWS ch. 106 § 2-103(1)(d).

455.    The AMD processors are and were at all relevant times "goods" within the meaning of MASS. GEN. LAWS ch. 106 § 2-105(1).

456.    Defendant marketed its processors to Plaintiff and the members of the Massachusetts Class, and made affirmative representations, as to the security and processing speeds of the

processors. Plaintiff and members of the Massachusetts Class were exposed to, and aware of, these representations.

457.    Defendant's express warranties formed the basis of the bargain in Plaintiff's and the Massachusetts Class's decision to purchase or lease AMD processors, or devices containing AMD processors. Defendant's various oral and written representations regarding the AMD processors' security and processing speed constituted express warranties to Plaintiff and the Massachusetts Class.

458.    An affirmation of fact, promise, or description made by the seller to the buyer which relates to the goods and becomes a part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation, promise, or description.

459.    Plaintiff and members of the Massachusetts Class used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors. As such, Defendant's express warranty regarding the benefits of the AMD processors extends directly to consumers like Plaintiff and members of the Massachusetts Class, who are intended third-party beneficiaries of any contract between Defendant and the retailers where AMD processors, or devices with AMD processors, were sold or leased.

460.    Defendant represented that its processors were secure and of particular processing speeds. AMD processors were not secure—given that they were subject to the Defect – and did not operate at stated processing speeds given that patches necessary to mitigate the Defect result in reduced processing performance.

461.    Plaintiff and members of the Massachusetts Class experienced the existence of the Defect in AMD processors but had no knowledge of the existence of the Defect, which was known and concealed by Defendant.

462.    Plaintiff and the Massachusetts Class could not have reasonably discovered the Defect in AMD processors prior to the public disclosure of the Defect by cybersecurity experts or prior to experiencing a known security hack resulting from the Defect.

463.    Because of the existence of the Defect, the AMD processors do not perform as warranted.

464.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of express warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

465.    Any attempt by Defendant to disclaim or limit the express warranties *vis-à-vis* consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  This reasoning equally applies to any attempt to limit the warranties Defendant furnished directly to Plaintiff and members of the Massachusetts Class through its marketing campaign, regardless of whether Plaintiff and members of the Massachusetts Class purchased or leased their AMD processors, or devices containing such processors, through the AMD processor in a Box program.

466.    A gross disparity in bargaining power existed between Defendant and Plaintiff and members of the Massachusetts Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

467.    Defendant knew that its processors were inherently defective and did not conform to their warranties.  Plaintiff and members of the Massachusetts Class were induced into purchasing or leasing AMD processors, or devices containing AMD processors, under false pretenses.

468.    Plaintiff and members of the Massachusetts Class have been excused from performance of any warranty obligations as a result of Defendant's conduct described herein.

469.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Massachusetts Class have been damaged in an amount to be determined at trial, including, but not limited to, repair and replacement costs, monetary losses associated with reduced

processor speeds, diminished value of their computer devices, and loss of use of or access to their computer devices.

**COUNT XXIII**
**Breach of Implied Warranty**
**MASS. GEN. LAWS ch. 106, §§ 2-314. 2-315**
**(On Behalf of the Massachusetts Class)**

470.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

471.    Plaintiff Caskey-Medina (for the purposes of this section, "Plaintiff") brings this Count on behalf of himself and the Massachusetts Class.

472.    Defendant is and was at all relevant times a "merchant" with respect to the AMD processors under MASS. GEN. LAWS ch. 106 § 2-104(1), and a "seller" of the AMD processors under MASS. GEN. LAWS Ch. § 2-103(1)(d).

473.    The AMD processors are and were at all relevant times "goods" within the meaning of MASS. GEN. LAWS ch. 106 § 2-105(1).

474.    A warranty that the AMD processors were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to MASS. GEN. LAWS ch. 106 § 2-314.

475.    In addition, a warranty that the AMD processors were fit for their particular purpose is implied by law pursuant to MASS. GEN. LAWS ch. 106 § 2-315.  Defendant knew at the time of sale of the AMD processors that Plaintiff and members of the Massachusetts Class intended to use those processors in a manner requiring a particular standard of security and performance, and that Plaintiff and members of the Massachusetts Class were relying on Defendants' skill and judgment to furnish suitable products for this particular purpose.

476.    Plaintiff and members of the Massachusetts Class purchased or leased AMD processors, or devices containing AMD processors, from Defendant, by and through Defendant's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers or lessors of AMD processors when purchased or leased from a third party.  At all relevant times, Defendant was the manufacturer, distributor, warrantor, and/or seller of the relevant processors.  Defendant knew or had reason to know of the specific use for which its processors were purchased or leased.

477.    AMD processors, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose due to the Defect, and the associated problems and failures caused by the Defect.   Thus, Defendant breached its implied warranty of merchantability.

478.    Plaintiff and members of the Massachusetts Class used Defendant's products and had business dealings with Defendant either directly or indirectly through third-parties, and were the intended recipients of Defendant's processors.   As such, Defendant's implied warranty regarding the benefits of the AMD processors extends directly to consumers like Plaintiff and members of the Massachusetts Class, who are intended third-party beneficiaries of any contract between Defendant and the retailers where AMD processors, or devices with AMD processors, were sold or leased.

479.    Defendant marketed its processors to Plaintiff and members of the Massachusetts Class as secure and of particular processing speeds.   Plaintiff and members of the Massachusetts Class were exposed to, and aware of, these representations.   Indeed, such representations formed the basis of their respective decisions to purchase or lease AMD processors, or devices containing AMD processors.

480.    The AMD processors were defective when they left Defendant's possession and, as such, could not perform according to Defendant's affirmative representations that the AMD processors were secure and of particular processing speeds.   Therefore, the AMD processors were not reasonably fit for their intended, anticipated, or reasonably foreseeable use.

481.    As a direct and proximate result of Defendant's breach of its implied warranty of merchantability, Plaintiff and members of the Massachusetts Class have been damaged in an amount to be proven at trial.

482.    Defendant cannot disclaim its warranties implied by law as it knowingly sold or leased a defective product.

483.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.   Affording Defendant a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused

to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.

484.   Any attempt by Defendant to disclaim or limit the implied warranty of merchantability *vis-à-vis* Plaintiff and members of the Massachusetts Class is unconscionable and unenforceable. Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Spectre Defect.   Among other things, Plaintiff and members of the Massachusetts Class did not participate in determining any warranty limitations, especially those which unreasonably favor Defendant.   A gross disparity in bargaining power existed between Defendant and Plaintiff and members of the Massachusetts Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors, and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

485.   Further, as a manufacturer of consumer goods, Defendant is precluded from excluding or modifying an implied warranty of merchantability or limiting customers' remedies for breach of this warranty.

486.   Plaintiff and members of the Massachusetts Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

487.   Defendant's warranties were designed to influence consumers who purchased or leased its processors, including products that contain them.

488.   Defendant is estopped by its conduct, as alleged herein, from disclaiming any and all implied warranties with respect to the defective processors.

489.   The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and Defendant's concealment.

1

2

### COUNT XXIV
### Violation of the MMWA,
### 15 U.S.C. § 2301, et seq.
### (On Behalf of the Massachusetts Class)

3

4

490.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

5

6

491.    Plaintiff Caskey-Medina (for the purposes of this section, "Plaintiff") brings this Count on behalf of himself and the Massachusetts Class.

7

8

9

492.    Plaintiff and members of the Massachusetts Class satisfy the MMWA's jurisdictional requirement because this action satisfies the diversity jurisdiction requirements under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

10

11

493.    Plaintiff and members of the Massachusetts Class are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

12

13

494.    Defendant is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

14

15

495.    AMD's processors are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

16

17

496.    The MMWA, 15 U.S.C. § 2310(d)(1), provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranties.

18

19

20

21

22

497.    Defendant provided Plaintiff and members of the Massachusetts Class with one or more express warranties, which are covered under the MMWA, 15 U.S.C. § 2301(6).  In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant directly provided warranty coverage for its processors, or indirectly provided warranty coverage for its processors under one or more manufacturer's warranties.

23

24

25

26

498.    Through written advertisements, Defendant marketed its processors to the Plaintiff and members of the Massachusetts Class as secure and of particular processing speeds.  Indeed, such representations formed the basis of the bargain in Plaintiff's and members of the Massachusetts Class' decision to purchase or lease AMD processors, or devices containing AMD processors.

27

28

499.    Plaintiff and members of the Massachusetts Class experienced the existence of the Defect in AMD processors within the warranty periods but had no knowledge of the existence of the

Defect, which was known and concealed by Defendant, and have not been provided a suitable repair or replacement of the defective processors free of charge within a reasonable time.

500.    Defendant provided Plaintiff and members of the Massachusetts Class with one or more implied warranties, which are covered under the MMWA, 15 U.S.C. § 2301(7).

501.    In connection with the purchase or lease of AMD processors, or devices containing AMD processors, Defendant breached these warranties by misrepresenting the standard, quality, or grade of its processors, and failing to disclose and fraudulently concealing the existence of the Defect in its processors.  AMD processors share a common defect in design, workmanship, and manufacture that is prone to security vulnerabilities and fails to operate as represented by Defendant.

502.    Defendant was provided notice of the Defect by independent research teams, and knew, or should have known, of the existence of the Defect much earlier.  Affording Defendant a reasonable opportunity to cure its breach of warranties would be unnecessary and futile here because Defendant has known of and concealed the Defect and, on information and belief, has refused to adequately repair or replace its processors free of charge within or outside of the warranty periods despite the Defect's existence at the time of sale or lease of the processors, or devices containing AMD processors.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff and members of the Massachusetts Class resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

503.    Any attempt by Defendant to disclaim or limit its express or implied warranties *vis-à-vis* consumers is unconscionable and unenforceable here.  Specifically, any warranty limitation is unenforceable because Defendant knowingly sold or leased a defective product without informing customers about the Defect.  Among other things, Plaintiff and members of the Massachusetts Class did not participate in determining any warranty limitations, especially those which unreasonably favor Defendant.  A gross disparity in bargaining power existed between Defendant and Plaintiff and members of the Massachusetts Class, and Defendant knew or should have known that its processors were defective at the time of sale or lease of the processors, or devices containing AMD processors,

and that its processors were defective and posed security vulnerabilities that, if mitigated, resulted in reduced processing performance.

504.    Plaintiff and members of the Massachusetts Class would suffer economic hardship if they returned their AMD processors, or devices containing the AMD processors, but did not receive the return of all payments made by them to Defendant.   Thus, Plaintiff and members of the Massachusetts Class have not reaccepted their AMD processors by retaining them.

505.    The amount in controversy of Plaintiff and members of the Massachusetts Class' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

506.    Plaintiff and members of the Massachusetts Class, individually and on behalf of the respective Classes, seek all damages permitted by law, including diminution in the value of the AMD processors, in an amount to be proven at trial.

### COUNT XXV
### Negligence
### (On Behalf of the Massachusetts Class)

507.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

508.    Plaintiff Caskey-Medina (for the purposes of this section, "Plaintiff") brings this Count on behalf of himself and the Massachusetts Class.

509.    Defendant owed a duty of care to Plaintiff and members of the Massachusetts Class, arising from the sensitivity of information stored on computers and the foreseeability of the impact of the Defect on data security, to exercise reasonable care in safeguarding sensitive information.

510.    Defendant also had a duty to ensure that its processors would function at the quality and processing speeds that it represented to customers, including Plaintiff and members of the Massachusetts Class.  This duty included, *inter alia*, designing, maintaining, monitoring, and testing its processors to ensure that Plaintiff's and members of the Massachusetts Class' data and computers were adequately secured and that its processors would function as promised.

511.    Defendant owed a duty to Plaintiff and members of the Massachusetts Class to implement processes that would detect major security vulnerabilities, such as the Defect, in a timely manner.

512.    Defendant also owed a duty to disclose the material fact that its processors were defective.

513.    But for Defendant's breach of its duties, Plaintiff and members of the Massachusetts Class would not have purchased or leased–or would have paid substantially less for–AMD processors (or devices containing AMD processors) had they known of the Defect and the reduction in processing performance associated with efforts necessary to mitigate the substantial security risks presented by the Defect.

514.    Plaintiff and members of the Massachusetts Class were foreseeable victims of Defendant's wrongdoing, and Defendant knew, or should have known, that its processors would cause damages to class members.

515.    The defective AMD processors are installed into larger devices which, by virtue of the Defect, are then less secure, less valuable and/or more exposed to hackers accessing private data stored on such devices.  The fact that the defective AMD processors are installed into computers and other devices is material because Plaintiffs and members of the Massachusetts Class had a reasonable expectation that their devices containing an AMD processor would not suffer from a defect that would expose their users' information to hackers.  No reasonable consumer expects a computer or device containing an AMD processor to contain a defect that exposes their users' information to hackers.

516.    As a direct and proximate result of Defendant's negligence, Plaintiff and members of the Massachusetts Class have been damaged in an amount to be proven at trial, including, but not limited to, compensatory damages, incidental and consequential damages, and other damages allowed by law.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendant and in favor of Plaintiffs and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the FED. R. CIV. P., declaring Plaintiffs as the representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and enjoining Defendant from continuing the unlawful, deceptive, harmful, and unfair business conduct and practices alleged herein;

C.    Appropriate injunctive and equitable relief;

D.    A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

E.    Costs, restitution, damages, including statutory and punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.


DATED: June 13, 2018                    Respectfully submitted,

                                        **KESSLER TOPAZ MELTZER**
                                        **  & CHECK, LLP**

                                        */s/Jennifer L. Joost*
                                        JENNIFER L. JOOST (Bar No. 296164)
                                        jjoost@ktmc.com
                                        One Sansome Street, Suite 1850
                                        San Francisco, CA 94104
                                        Tel:  (415) 400-3000
                                        Fax:  (415) 400-3001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-and-

JOSEPH H. MELTZER (*Pro Hac Vice*)
jmeltzer@ktmc.com
SAMANTHA HOLBROOK (*Pro Hac Vice*)
sholbrook@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax: (610) 667-7056

**ROBBINS GELLER RUDMAN
& DOWD LLP**
ROBERT M. ROTHMAN (*Pro Hac Vice*)
rrothman@rgrdlaw.com
58 South Service Road, Suite 200
Melville, NY 11747
Tel: (631) 367-7100
Fax: (631) 367-1173

-and-

STUART A. DAVIDSON (*Pro Hac Vice*)
sdavidson@rgrdlaw.com
RICARDO J. MARENCO (*Pro Hac Vice*)
rmarenco@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel:  (561) 750-3000
Fax:  (561) 750-3364

*Interim Co-Lead Plaintiffs' Counsel*